STATE of Minnesota, Respondent,

v.

John Charles CAULFIELD, Appellant.

No. 46813.

Supreme Court of Minnesota.

July 21, 1978.

C. Paul Jones, Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., William Randall, County Atty., Steven C. DeCoster, Asst. County Atty., St. Paul, for respondent.

Heard before KELLY, YETKA, and SCOTT, JJ., and considered and decided by the court en banc.

PER CURIAM.

This is an appeal from a conviction by a jury in the Ramsey County District Court for possession of a forged instrument with intent to utter, in violation of Minn.St. 609.-625, subds. 1 and 3. We affirm.

On December 19, 1975, defendant and three other persons, Richard Frikken, Janice Burnett, and Mrs. Burnett's 15-year-old daughter, Tamara Johnson, were arrested following Tamara's unsuccessful attempt to pass a forged check. The state filed no charges against Frikken, and informally agreed not to prosecute Janice Burnett and Tamara Johnson in return for their testimony against defendant. Because their testimony conflicts with that of defendant and

because defendant argues that the accomplice testimony was insufficiently corroborated, a detailed recitation of the facts is necessary.

Janice Burnett testified that on December 8, 1975, she and her friend Margie Skaggs were discussing in the Clover Club Bar in St. Paul the fact that she was broke, when a man she didn't know volunteered to send someone to her house with checks that she could cash. On December 10, 1975, defendant, whom she had not met before, came to her house and asked her whether she wanted to write some checks, assuring her that it wasn't dangerous. After she agreed, defendant went out to his car and brought in a white plastic bag containing 14 payroll checks, 13 bearing the name of the Como Gopher Women's Auxiliary (Como)[1] and one of West Publishing Company, together with a billfold, checkbook, and identification of one Sandra Johnson. Burnett agreed to cash the checks in a number of bars and to split the proceeds with defendant.

When defendant refused to use his automobile, Burnett left him in her residence and went across the street to the Hilltop Tavern to ask Richard Frikken, a friend she had been seeing since her separation from her husband, whether she could borrow his car to look for her husband at a number of bars. Frikken then drove Burnett, Margie Skaggs, and defendant to nine bars. At each bar, all four ordered one drink and Burnett cashed a Como check made out to Sandra Johnson. Margie Skaggs, who had identification belonging to Susan Asmus, also cashed checks made out in that name at most of the same bars. Frikken, although he had accompanied the women into most of the bars, was only aware of Burnett cashing one check, that at a Mr. Robert's Bar. There, Rodney LeClaire, the bartender-manager, asked Frikken to vouch for Burnett, which he did.[2]

On December 18, 1975, Burnett persuaded her 15-year-old daughter to write some checks. Burnett testified that Tamara agreed to cash personal checks, and knew nothing about the payroll checks or Burnett's check-cashing activities until the arrest. Tamara, on the other hand, testified that she had cashed a Como check several days prior to the above conversation while shopping for groceries with defendant, and that her mother was unaware of her check-cashing activities.

In any event, on December 19, 1975, Burnett called defendant at a number he had given her, and he came to her house. Tamara Johnson selected the Susan Asmus identification and checkbook and went downtown with Margie Skaggs and her mother in Frikken's car, which Burnett had borrowed. After Tamara cashed several checks the three returned home about 3:00 or 3:30 p. m., and Burnett returned the car keys to Frikken. Later that day, at about 6:30 p. m., Burnett again asked Frikken to borrow his car to do some Christmas shopping. Frikken volunteered to drive because he had some shopping to do also. Frikken, accompanied by defendant, Janice Burnett and Tamara Johnson, drove to the Phalen Shopping Center.

At the shopping center, Frikken, Burnett, and Johnson went into the Penney's store and did some shopping. The three then entered the Lancer's store. Burnett bought a leisure suit and shirt for Frikken, paying for it in cash when the manager said he could not cash a payroll check. Frikken and Burnett then went next door to the Stable store, while Tamara remained in the Lancer store.

Tamara then offered to pay for some merchandise at Lancer's with a personal "Susan Asmus" check, written for the amount of $52. Because a check of that size required credit department authorization, the manager at Lancer's questioned

---

1. The Como Gopher Women's Auxiliary account at Commercial State Bank had been closed in May of 1974 upon the report of a theft of blank checks from that organization.

2. Frikken testified that he made a $20 payment on the check after it was returned to LeClaire marked "Account Closed" because he felt responsible, despite his not having known at the time that the check was stolen.

Tamara as to the correct address and telephone number. The manager then called the credit department to get an authorization to accept the check. Tamara then claimed that the address and telephone number on the check were incorrect because she had moved. The manager returned the check to Tamara because she was unable to give him any telephone number which was listed in her name. She then left the store.

In the meantime the manager summoned an employee of the store, Tim Asmus, and asked him if he had a relative by the name of Susan Asmus. Tim responded that he did and, when the address on the check corresponded with that of Tim's relative, he attempted to telephone Susan Asmus to see if her checks had been stolen. While Tim was attempting to contact his cousin, the manager spotted Frikken and Janice Burnett, who he thought were Tamara's parents, walking by the front of the store. The manager then told Tim to follow the couple while he contacted a security officer at the shopping center. Tim Asmus followed them to a green 1970 Chevrolet station wagon, where he asked them if either had tried to pass his cousin's check in Lancer's. He took the license number of the car after receiving a negative response.

The security guard, an off-duty St. Paul police officer, who had been contacted by the manager, stopped a police squad car going by at the time, and he and Tim Asmus got in and followed the station wagon to Maryland and Duluth Streets where it was stopped. The security officer approached the vehicle and asked Janice Burnett if she had any identification and whether they had just come from Lancer's. Burnett identified herself as Sandra Johnson, stated that she had no identification, and denied that she had been in Lancer's. The officer then asked the occupants of the car to return to the shopping center to clear up the confusion surrounding the check that allegedly had been offered. Frikken, who was driving, readily agreed, and drove to the shopping center, followed by the squad car.

There is a conflict in the testimony concerning what occurred in the car while enroute to the shopping center. Janice Burnett testified that she handed defendant the Como checks made out to Sandra Johnson and the identification and checkbook bearing the same name. She said defendant handed them all back to her, whereupon she put the identification and checkbook in her purse and returned the Como checks to defendant, who put them in a bag in the front seat. She also testified that Tamara handed defendant the items bearing the name of Susan Asmus. Defendant testified that he did not recall any exchange of checks or identification in the car while returning to the shopping center, any paper bag in the front seat, or his placing anything in a paper bag.

Once back at the store, the security officer asked the women if they had Susan Asmus' checkbook or identification with them, and both denied involvement. Janice Burnett then voluntarily opened her purse, revealing a checkbook, identification, and a Como check, all bearing the name of Sandra Johnson. With the Asmus checkbook and identification still missing, the officer suggested to Frikken that they might be in his car. Frikken, in turn, suggested that the officer look in the car. The subsequent search uncovered a bag bearing a "Stable" label in the front seat, next to which defendant was still seated; inside the bag the officer found six Como checks, five payable to Sandra Johnson and one payable to Susan Asmus, and the checkbook and identification of Susan Asmus. Inside the Asmus checkbook the officer found a personal check payable to Lancer's for $52 and signed Susan Asmus. The officer then took Frikken, Janice Burnett and Tamara Johnson into Lancer's and confronted the two women and the store manager with the checkbook and check. The store manager recognized the two women, and positively identified both the checkbook and check. Tamara denied ever seeing the checkbook before, whereupon all three persons were placed under arrest, given *Miranda* warnings, and placed in the squad car. Defendant, who was standing outside the store,

was also arrested and given the *Miranda* warning when he started to walk away. A more thorough search of Frikken's car netted another Como check; still another was found on the ground near the car.

Defendant's testimony at trial directly conflicted with that of Burnett and her daughter. In addition to the conflict already mentioned concerning the activities in Frikken's car as it returned to the shopping center, defendant testified that he had known Richard Frikken for several years before the Phalen incident and that he met Frikken by chance in a bar across the road from Janice Burnett's home on December 19, 1975. He said he thought he had met Frikken and Burnett in that same bar about a week and a half earlier, but also might have seen Burnett with Frikken on another occasion. Defendant testified that when he again encountered the couple on December 19 Frikken told him he was going to take Burnett and her daughter to Phalen to shop and that he and Frikken decided to go to the Petite Lounge at the center.

When they arrived at Phalen, the defendant continued, he went to the Petite Lounge while Frikken and the women went shopping. He said he met Frikken and the women back at the car just as they were getting into it. After they were flagged down by the police, there was some excited conversation about checks, but he did not recall when the "Stable" bag was placed on the front seat. He testified that he had not seen any Como Gopher Women's Auxiliary checks before the night of December 19 and that he had not received any money from Richard Frikken or the women.

On appeal defendant argues for the first time that his custodial statements and the prosecutor's reference to them violated his Fifth Amendment privilege against self-incrimination and his Fourteenth Amendment right to due process of law. Defendant also argues that there was insufficient corroboration of the accomplice testimony.

The constitutional claim is based on the booking officer's testimony introduced in the state's case in chief, relating his conversation with defendant during the booking process concerning defendant's possession of $338 in cash at the time of his arrest. That testimony reads as follows:

"Q. Okay. Was anything handed to you by a Ramsey County Sheriff?

"A. Yes.

"Q. What was that?

"A. There was a quantity of money. Part of the process is for the suspects to empty their pockets of all valuables and the Ramsey County Sheriffs inventoried any money or valuables that are in there. The party had $338.

"Q. Mr. Caulfield did?

"A. Yes, I think that—I'm not perfectly sure about the amount but it was in that range, 330, 338 or something.

"Q. Did you say anything to Mr. Caulfield at this time?

"A. I asked him—part of the booking process is the interview and he had stated—and he had stated to the Ramsey County Sheriff that he was unemployed at the time, and therefore I asked him where he got the money and he told me that it was none of my business, that it was his money and he didn't have to say where he got the money, so then I took the—I told Mr. Caulfield at that time that because of the charge that was involved here, that of uttering a forged instrument, I was going to confiscate the money as evidence, which I did, and the Ramsey County Sheriffs put it in a small bag for me and I placed it in crime lab locker number three, or property locker number three; I'm sorry."

During closing argument the prosecuting attorney specifically referred to the officer's testimony in reminding the jury that defendant offered no explanation of the money either to the officer or to the jury in his testimony at trial. Defendant's position is that his answer to the officer's question concerning the cash after having been given a *Miranda* warning—specifically that he didn't have to say where he got the money—was an exercise of his Fifth Amend-

ment privilege to remain silent and that the prosecutor's reference to it violated his rights as articulated in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The state, relying principally on *United States v. Joyner,* 539 F.2d 1162 (8 Cir. 1976), argues that defendant's statement was not an assertion of his right to remain silent but rather was a direct answer voluntarily given. The state further argues that even if defendant's statement could be considered an exercise of his right to remain silent, defendant by repeatedly failing to object to the statement's admission effectively waived his Fifth Amendment privilege.

 Had defendant merely stated that the source of the money was none of the officer's business, we might be inclined to agree with the state. Since defendant added, however, that he didn't have to say where he got the money and the record is silent as to any other statements by defendant, it would be difficult not to interpret defendant's statement as an assertion of his right to remain silent. See, *State v. Walker,* 306 Minn. 105, 235 N.W.2d 810 (1975). At the very least defendant's statement was ambiguous. We need not decide that issue, however, because we agree with the state that defendant effectively waived any such Fifth Amendment privilege.

Such waiver is clearly evidenced in the record. First, after defendant's statement was disclosed by the Rasmussen notice,[3] defense counsel waived all constitutional issues except the seizure of evidentiary items taken from Richard Frikken's car and defendant's person. The district court's order denying defense counsel's suppression motion specifically referred to the waiver. Further, the officer's testimony concerning defendant's statement was introduced at the pre-trial hearing. At least at that time defendant's counsel was fully aware of the statement's content. Yet at trial the statement was admitted wholly without objection.[4]

Second, defendant testified on his own behalf, thereby waiving his Fifth Amendment privilege against self-incrimination at trial, without explaining his possession of the money. In his closing argument the prosecutor then commented on the absence of defendant's explanation both after his arrest and in his trial testimony. While reference to the former was arguably improper, reference to the latter was not. See, *Caminetti v. United States,* 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917) where the defendant testified as to certain facts but refrained from testifying as to others within his knowledge; defendant's silence as to the other facts was therefore subject to the inferences naturally drawn. See, McCormick, Evidence, §§ 132, 272 (Cleary ed. 1962.) Further, defense counsel here neither objected to the prosecutor's closing remarks nor requested curative instructions. See, *State v. Bradley,* 304 Minn. 11, 228 N.W.2d 863 (1975).

Finally, the admissibility of the statement was nowhere mentioned in defendant's post-trial motion for a new trial or for judgment of acquittal, notwithstanding 17 paragraphs of allegations in support of that motion. In sum, it would be difficult to imagine a more clear showing of waiver.

 Defendant acknowledges his failure to raise the issue at trial but argues that he still is entitled to a new trial. We do not agree. Assuming that the statement's admission was constitutional error, the error was harmless beyond a reasonable doubt. See, *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Jankord v. State,* 290 Minn. 168, 186 N.W.2d 530 (1971). As our detailed recitation of facts shows, the jury had before it overwhelming evidence of defendant's guilt.

 As to the corroboration of the testimony of the two accomplices, the defendant was readily connected with this crime by his conduct and presence with the others at the

---

3. Rule 7.01, Rules of Criminal Procedure.

4. In fact, defense counsel on cross-examination of the officer attempted to explain away the implication of defendant's statemert.

scene, by his unexplained affluence, and by certain inadequacies and items of his testimony. We therefore see no merit to this contention. *State v. Mathiason,* 267 Minn. 393, 127 N.W.2d 534 (1964).

Affirmed.