STATE of Minnesota, Respondent,

v.

Edward R. CLARK, Appellant.

Nos. 45762, 48668.

Supreme Court of Minnesota.

July 3, 1980.

See also, 296 N.W.2d 372.

C. Paul Jones, Public Defender and Ronald Haskvitz, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Richard Mark, and Gary Hansen, Asst. Attys. Gen., St. Paul, John Corbey, County Atty., Mankato, for respondent.

Heard before SHERAN, C. J., ROGOSHESKE, and WAHL, JJ., and considered and decided by the court en banc.

ROGOSHESKE, Justice.

Edward R. Clark was convicted by a district court jury of the first-degree murder of Michael Jiminez. He appeals from the judgment of conviction and from an order denying his petition for postconviction relief. Defendant raises many issues on appeal, the most significant of which are: (1) whether admission of statements made by defendant during custodial interrogations constituted reversible error; (2) whether admission of extrinsic evidence concerning a collateral alleged theft denied defendant due process of law; (3) whether admission of evidence, including photographs, relating to the death of Barbara Jiminez, Michael's wife, unfairly prejudiced defendant; (4) whether defendant's warrantless arrest and the search incident thereto were unlawful; (5) whether the searches of defendant's vehicle and storage locker were unlawful; (6) whether the prosecution failed to produce exculpatory evidence such that a new trial is required; (7) whether prosecutorial misconduct requiring a new trial occurred; and (8) whether the verdict is supported by the evidence. While we agree with some of defendant's claims of error, we conclude that the errors that occurred, taken either

individually or cumulatively, do not warrant a new trial. We accordingly affirm.

In February 1974, defendant, who was experiencing business difficulties, left his home and family in Ferndale, Michigan, and traveled to Sacramento, California, where he spent two weeks with his wife's parents. Upon learning that a lawsuit had been commenced against him in Michigan, he rented a room near Sacramento, in the residence of Eugene and Sarah Ward, under the name of Edward Williams. He resided there from March 1 to April 18. From March 4 to April 5, defendant was employed as an auto mechanic by Burke Chevrolet in Folsom, California. At work he was given a supply of pens inscribed with "Tom Hitchner, Quaker State Motor Oil, Sacramento, California." On March 9, 1974, defendant rented a portable typewriter from California Business Machines. Landlady Sarah Ward saw a typewriter and a gun case that appeared to contain a gun in defendant's room.

On April 18 defendant left the Wards, stating that he was going to Oregon. He loaded his belongings into a Ford Bronco with Michigan license plates. The following day, April 19, he returned the rented typewriter, received a receipt, and proceeded not to Oregon but to Nevada. At about 10:20 that evening, defendant cashed several traveler's checks at Harrah's Casino Motel near Lake Tahoe. On the morning of April 20, defendant continued to Reno and then drove east on Interstate 80, stopping only occasionally to take naps of approximately 45 minutes.

In the meantime, Michael and Barbara Jiminez, a married couple, were spending the weekend with Michael's sister in Emporia, Kansas. At about noon on Sunday, April 21, the couple began hitchhiking north on Interstate 35, intending to return to their home in Mankato, Minnesota. They carried a knapsack, a duffel bag, and a sign made from a grocery sack marked "35N." Early Sunday evening defendant picked up Michael and Barbara Jiminez near Des Moines, Iowa, where Interstates 80 and 35 run together. Later that evening, defendant cashed a traveler's check at a truckstop on Interstate 35 near Ames, Iowa.

On April 22 at about 5 p. m. defendant called his home in Ferndale, Michigan, from an oasis plaza on Interstate 90 near Belvidere, Illinois, and spoke with his wife. Defendant arrived home at approximately 1 a. m. on April 23. At about 3 a. m., he went to his mother's home.

Late in the morning of April 23, the body of Michael Jiminez was found beneath two railroad ties near Smith's Mill, Minnesota. The cause of death was a gunshot wound to the back of the head. Near the body were an empty .44 magnum cartridge, two ballpoint pens with the lettering "Tom Hitchner, Quaker State Motor Oil, Sacramento, California," and a matchbook from Harrah's Casino Motel. A pathologist placed the time of death between dark on the evening of April 22 and 3 a. m. on April 23. He admitted that his estimation was approximate and that it was based in part on the fact that the busy nature of the area would have made a daytime murder unlikely.

The identification of Michael Jiminez' body prompted a search for his missing wife. On April 28, a jacket belonging to Barbara Jiminez was found on the bank of the Cannon River within a few miles of Smith's Mill. Several days later, on May 2, a cardboard box containing a grocery bag with "35N" printed on it, an Iowa roadmap, a duffel bag, a black stocking, a green sweater, a windbreaker, two pairs of jeans, a bandana, panties, a red and black stocking, and a brassiere, items belonging to the Jiminez couple, was found in nearby Sakatah Lake State Park. Also in the box were a plastic glass, a box of Medico pipe cleaners, a bingo coupon from Harrah's Casino Motel, two receipts for typewriters made out to Edward Clark from California Business Machines, and a sticker indicating protection by an electronic alarm system. Following these discoveries, Sacramento authorities were contacted.

Barbara Jiminez' nude body was found on May 4 lying face down in the water near the shore of Scotch Lake. One of her shoes

was found in the crotch of a nearby tree, and a fragment of knotted pink cloth with some hairs the same color as Barbara's tied in the knot was lying on the ground. Autopsy revealed that strangulation was the most likely cause of death, although drowning could not be ruled out. Consistent with the strangulation theory, two thick strands of Barbara's long hair were wrapped across her neck.

On May 6, 1974, defendant returned to California Business Machines to rent a typewriter. The owner alerted the Sacramento County Sheriff's office and provided the license number of the Bronco. Shortly before midnight, officers observed the Bronco outside a bar and, after making positive identification, entered the bar and arrested defendant. The police impounded the vehicle.

At the jail, defendant was advised of his *Miranda* rights and refused to sign a waiver of those rights. When the charges were explained, defendant stated that he had not been in Minnesota for 3 years and that the evidence must have been planted by his former business partners.

While inventorying defendant's personal belongings at the time of booking, police found receipts for traveler's checks and for rental of a storage shelter. On May 7, they investigated the storage facility and obtained a warrant for the search of a shelter rented in the name of Edward R. Richardson. They executed the warrant on May 8 and found a .44 magnum Luger carbine and some cartridges, a torn pink sheet, some traveler's checks, publicity brochures from Harrah's Casino Motel, and a box of plastic cups. Tests revealed that the rifle had fired the cartridge found by Michael Jiminez' body and that the pink sheet was the cloth from which the fragment found near Barbara Jiminez' body had been torn.

The police obtained an additional warrant and searched defendant's Bronco. The search produced pipes, pipe tobacco, pipe cleaners, a box of Medico filters, and stickers indicating protection by an electronic alarm system. Each window of the Bronco had an identical sticker affixed to it.

Defendant was returned to Minnesota and indicted on two counts of first-degree murder. He was first tried for the murder of Michael Jiminez. At trial he took the stand and testified that he had picked up a third hitchhiker in addition to the Jiminezes and that he had allowed the unidentified hitchhiker to drive his vehicle. He stated that he fell asleep and awoke at a truckstop where he cashed a traveler's check. Defendant claimed that he again slept until the early morning hours of April 22, when he awoke alone on a gravel road in rural Minnesota and that he searched for the hitchhikers for about an hour and then threw out a cardboard box containing items of their clothing. The jury rejected this alibi and convicted defendant. He was sentenced to life imprisonment and now appeals from the judgment and from an order denying his petition for postconviction relief.

We first consider whether the admission of certain statements made by defendant while in custody constitutes reversible error. Defendant challenges the use of three specific statements—(1) his assertion to Sacramento authorities, when informed of the typewriter receipt found with the Jiminez clothing, that he had not been in Minnesota for 3 years; (2) his refusal to discuss the murders with Sacramento authorities or to sign a waiver of his fifth and sixth amendment rights; and (3) his exculpatory remarks made to Sheriffs Wiebold and Smith of the Minnesota counties where the bodies were found. Both statements to Sacramento authorities were introduced in the state's case in chief, while the statements to Minnesota authorities were used solely as impeachment evidence. We address each claim of error separately.

 There is no question that defendant's statement—that he had not been in Minnesota for 3 years—followed his refusal to sign a waiver of counsel and his expression of a desire to remain silent until he consulted an attorney. There is some question, however, whether the statement was made in response to "interrogation" as defined in *Miranda v. Arizona*, 384 U.S. 436,

86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). After the defendant invoked his rights, the Sacramento authorities told him that they had cause to believe that he had committed two murders in Minnesota and that they found the ballpoint pens and typewriter receipts tying him to the scene of the crime.[1] Whether these statements by the officers constitute "interrogation" under *Miranda* depends on whether they were "reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, —— U.S. ——, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980).[2] We need not decide this issue, however, because we hold that even if "interrogation" did in fact take place, there is no reasonable possibility that the admission into evidence of defendant's statements in response to the "interrogation" contributed to his conviction and that the error was therefore harmless.[3] *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The only basis for defendant's claim that the error was prejudicial is that introduction of the statement in the state's case in chief resulted in impeachment of defendant's veracity before he presented his alibi defense. The prosecution's use of the statement in its case in chief could not have influenced defendant to take the stand to explain inconsistencies, since the only inconsistency was in the state's own evidence and that inconsistency was exculpatory. It is plain that defendant's decision to testify was prompted by the fact that the incriminating evidence, although circumstantial, was substantial, and defendant's presentation of his explanation of that evidence to the jury required that he, as the sole witness, testify. We recognize that credibility is extremely important where a defendant asserts an alibi

defense, and we agree that in some close cases the admission of impeachment evidence before the defendant takes the stand may not be harmless. In the present case, however, evidence tending to support the alibi is totally absent and the alibi itself is inherently incredible in light of the overwhelming evidence of guilt. *State v. Hull*, 269 N.W.2d 905 (Minn.1978). Defendant admittedly picked up the Jiminezes. He admittedly owned items found in the box with their discarded clothing and near Michael's body. Using an alias, he had rented a storage shelter, wherein the rifle that fired the cartridge that killed Michael and the pink sheet, a portion of which was used to gag Barbara, were found. We conclude that admission of the statement was harmless error.

Defendant also contends that the testimony of Sacramento authorities that defendant had exercised his right to remain silent was prejudicial error even though the testimony was stricken and the jurors were instructed to disregard it. Since the officers' statements were not foundation for the admission of a voluntary confession, their use tends to encourage speculation that defendant remained silent because he was guilty, and therefore such use impermissibly penalizes defendant for exercising his constitutional rights. *State v. Roberts*, 296 Minn. 347, 208 N.W.2d 744 (1973); *State v. Beck*, 289 Minn. 287, 183 N.W.2d 781 (1971). We conclude that the error is harmless, however, because defense counsel elicited the same information on cross-examination of one of the officers. Our reading of the record indicates that the defense broached the subject in an attempt to gain sympathy for the defendant because he had been without an attorney for some time

---

1. The State notes that Cal. Penal Code § 841 (West 1970) provides that "[t]he person making the arrest must, on the request of the person he is arresting, inform the latter of the offense for which he is being arrested."

2. Resolution of this issue depends partly on whether the police have any knowledge of any unusual susceptibility of the defendant to a particular sort of persuasion. 100 S.Ct. at 1690 n. 8.

3. Assuming arguendo interrogation took place, where the state has made no showing that defendant intentionally relinquished his known right to counsel, we would be compelled to agree with the postconviction court that defendant's sixth amendment rights were violated and that the evidence should have been excluded. *State v. Giddings*, 290 N.W.2d 595 (Minn. 1980); *see State v. Crisler*, 285 N.W.2d 679 (Minn.1979).

following his arrest, not simply to counteract damage done by the state's mentioning defendant's assertion of rights.[4]

■ Defendant further argues that the trial court erred by permitting the state to impeach him with statements obtained by Sheriffs Wiebold and Smith in violation of his *Miranda* rights. While *Miranda* bars the prosecution from making its case with statements of an accused made during a custodial interrogation without first effectively waiving constitutional rights, it does not preclude use of such statements for impeachment purposes so long as the statements are voluntary and trustworthy. *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *In re Welfare of Jerome Larson,* 254 N.W.2d 388 (Minn. 1977); *State v. Gabler,* 294 Minn. 45, 199 N.W.2d 439 (1972). We cannot agree that defendant's statements were coerced and therefore involuntary and untrustworthy. First, as will be more fully discussed later, defendant's arrest and detention were lawful. Second, defendant displayed knowledge of his rights and set the ground rules for the interrogation by refusing to discuss the murders but consenting to answer questions concerning "personal" matters. The transcript indicates that he distinguished throughout the interview between questions he would answer and those he would not. We therefore conclude that the requirements of *Harris* were satisfied.[5]

Defendant next contends that he was improperly cross-examined concerning whether the Bronco he was driving when he picked up the Jiminezes was stolen and that the prosecution's introduction of extrinsic evidence to prove that it was stolen was prejudicial error. On direct examination defense counsel inquired into when defendant had acquired the Bronco, the model year of the vehicle, and the nature of modifications to the vehicle made by defendant. On cross-examination, the prosecutor impeached defendant's testimony by eliciting the admission that defendant knew the Bronco was a stolen 1973 model rather than a 1967 model and by asking whether defendant and one Ed Newberg stole it. Defendant denied that he and Newberg had stolen the vehicle. Subsequently, the state called Newberg, who testified that defendant had stolen the 1973 Bronco, sold his older Bronco to Newberg, told Newberg not to drive it on the road, and upon his return from California repurchased the title to the 1967 Bronco.

■ Generally the state may impeach a defendant's credibility by cross-examining him in relation to matters opened on direct even though such inquiry brings out collateral criminal conduct. *State v. Fulford,* 290 Minn. 236, 187 N.W.2d 270 (1971). In addition, specific instances of conduct bearing on the credibility of a witness may, in the discretion of the trial judge, be elicited on cross-examination if probative value is not outweighed by the risk of undue consumption of time, surprise, or prejudice. *State v. Haney,* 219 Minn. 518, 18 N.W.2d 315 (1945); *see* Minn.R.Evid. 608(b), and 3 Weinstein's Evidence ¶ 608(05). Since defendant insisted on direct examination that the vehicle he was driving at the time of

---

4. Defendant makes the related argument that the prosecutor's cross-examination establishing that defendant did not describe the third hitchhiker and his argument to that effect constitutes an improper comment on defendant's right to remain silent under *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and *State v. Billups,* 264 N.W.2d 137 (Minn. 1978). Defendant, however, did not object to either the testimony or the argument nor did he request curative instructions. Under these circumstances he has waived his right to press the claim. *See State v. Hofmaster,* 288 N.W.2d 218 (Minn.1979); *State v. Caulfield,* 269 N.W.2d 350 (Minn.1978); *State v. Schneider,* 311 Minn. 566, 249 N.W.2d 720 (1977).

5. These tape-recorded statements were initially ruled admissible at the evidentiary hearing and the prosecutor referred to them in his opening statement. During trial, the motion to suppress was renewed and, following an *in camera* playing of the tape, the motion was granted. The court informed the jury that it would not hear the tape. Defendant argues on appeal that he was prejudiced by this series of events. Our conclusion that the information referred to in the opening statement was properly brought out on cross-examination is dispositive of this issue.

the murders and when arrested was a 1967 model Bronco he had owned since 1968, the state was free to impeach by eliciting an admission that the vehicle was in fact a stolen 1973 model.[6] To the extent inquiry into the circumstances of the theft and defendant's dealings with Newberg can be viewed as beyond the scope of the direct examination, they are specific instances of conduct bearing on credibility. In our view auto theft of the type described is sufficiently akin to crimes of dishonesty, such as forgery, bribery, fraud, and perjury, typically viewed as relevant to veracity. We therefore conclude that the trial court properly allowed the cross-examination.[7]

▇▇▇▇ Because cross-examination as to specific instances of conduct, whether within the scope of direct examination or independently proper cross-examination, is deemed inquiry into collateral matters, the cross-examiner may not disprove the answer by extrinsic evidence; he must take the witness' answer. *State v. Sharich*, 297 Minn. 19, 209 N.W.2d 907 (1973); *State v. Nelson*, 148 Minn. 285, 181 N.W. 850 (1921). Admission of extrinsic evidence rebutting defendant's denial that he stole the Bronco was error. In considering whether admission of evidence of collateral criminal conduct was so prejudicial as to deprive defendant of a fair trial, we have stated that to deny relief we must hold that the guilt of defendant was conclusively proven. *State v. Dinneen*, 300 Minn. 354, 220 N.W.2d 292 (1974). As stated previously, the evidence of defendant's guilt is overwhelming. Moreover, defendant admitted on proper cross-examination that he had been convicted of auto theft. The additional evidence that defendant had participated in the theft of the Bronco, the vehicle involved in the crime, could not reasonably be said to have significantly altered the jury's perception of his character. Finally, the collateral bad acts proved at trial were nonviolent property offenses which do not give rise to an inference that defendant committed murder and cannot be expected to have substantially prejudiced the jury.

Defendant further argues that admission of evidence relating to the death of Barbara Jiminez, including numerous photographs, denied him due process of law. In *State v. Sweeney*, 180 Minn. 450, 455, 231 N.W. 225, 227 (1930), we stated the general rule as follows:

> The general rule in a criminal case is that evidence which in any manner shows or tends to show that the accused has committed another crime independent of that for which he is on trial is inadmissible. The reason is obvious and the rule should be rigorously enforced. The rule, however, like most rules, has certain exceptions not to be stated categorically but among which evidence of other crimes is admissible to prove the accusation when it tends to establish (1) motive, (2) intent, (3) absence of mistake or accident, (4) the identity of the accused, (5) sex crimes, (6) a common scheme or plan embracing the commission of similar crimes so related to each other that proof of one or more of such tends to establish the accusation. Such is the common law.

6. Defendant objected to this line of cross-examination only on grounds that no *Spreigl* notice had been provided. We have held, however, that such notice is required only when the evidence of collateral crimes will be presented in the state's case in chief. *State v. Fulford*, 290 Minn. 236, 187 N.W.2d 270 (1971).

7. We are mindful that defendant also claims error due to failure to instruct the jury that the evidence was admissible only as impeachment, not as substantive evidence. In *State v. Billstrom*, 276 Minn. 174, 149 N.W.2d 281 (1967), we held that where the state intends to offer other-crimes evidence in its case in chief not only must a *Spreigl* notice be given and the exception to the exclusionary rule specified, but the court must admonish the jury that the defendant is on trial only for the offense charged. *Accord, State v. Dinneen*, 300 Minn. 354, 220 N.W.2d 295 (1974). In *State v. Forsman*, 260 N.W.2d 160 (Minn.1977), we further held that if a *Spreigl* notice is given, failure of defense counsel to request a limiting instruction at trial waives the requirement. This entire line of cases does not control the present case, since the evidence here was used as impeachment and no notice was required. Furthermore, no request for a limiting instruction was made, and the claim of error is, in any event, waived.

In *State v. Wofford*, 262 Minn. 112, 118, 114 N.W.2d 267, 271 (1962), we further stated that—

> [W]here two or more offenses are linked together in point of time or circumstances so that one cannot be fully shown without proving the other * * * [the evidence of the other crime] is admissible. * * * Such evidence may be considered only for the purpose for which it is sought to be introduced, regardless of the fact that it may incidentally show commission of some other offense. Such evidence, however, must show a causal relation or connection between the two acts so that they may reasonably be said to be part of one transaction.

*See also State v. Marsyla*, 269 N.W.2d 2 (Minn.1978); *State v. Lindsey*, 507 S.W.2d 1 (Mo.1974).

▆▆▆ We agree with the trial court's conclusion that the evidence was admissible. The circumstances were such that the murder of Michael Jiminez could not have been fully presented to the jury without demonstrating what happened to his wife. The evidence showed that the Jiminezes were hitchhiking together, that defendant picked them both up, and that both were found murdered. Evidence linking defendant to the murders was found near each body and in the box, found at a third location, which contained their clothing. But for the fortuity that the victims' bodies were found in separate counties, the prosecutions would have been simultaneous, and we cannot agree that the trial court abused its discretion in admitting evidence of the wife's murder in the trial for the husband's murder.[8]

▆▆▆ Since testimony concerning Barbara Jiminez' murder was admissible under the common-scheme or same-criminal-episode exception to the rule excluding evidence of other crimes, photographs were also admissible under that exception. In

*State v. DeZeler*, 230 Minn. 39, 46–47, 41 N.W.2d 313, 319 (1950), we stated the rule as follows:

> Photographs are admissible as competent evidence where they *accurately* portray anything which it is competent for a witness to describe in words, or where they are helpful as an aid to a verbal description of objects and conditions, provided they are relevant to some material issue; and they are not rendered inadmissible merely because they vividly bring to jurors the details of a shocking crime or incidentally tend to arouse passion or prejudice. This is the general rule, and any other would be an anachronism in this day when pictures are a common and recognized medium for the accurate portrayal of objects and events.

The photographs of Barbara Jiminez' body meet this test.

▆▆▆ Defendant next argues that his arrest in California and the search incident thereto were unlawful because the officers lacked probable cause to believe that he had committed a crime. When a warrantless arrest is made, the state, at the *Rasmussen* hearing, must present evidence indicating that at the time of the arrest the police had factual information from reliable sources from which they could conclude that there was probable cause to believe defendant committed the felony. The court must then determine whether an officer, based upon his observations, information, and police experience, reasonably could have believed that the person to be arrested had committed a crime. *State v. Merrill*, 274 N.W.2d 99 (Minn.1978). The arresting officers need not have personal knowledge of the facts constituting probable cause but may rely on information received from other law enforcement officials. *McLaughlin v. State*, 291 Minn. 277, 190 N.W.2d 867 (1971).

**8.** Under *State v. Billstrom*, 276 Minn. 174, 149 N.W.2d 281 (1967), the trial court was required to instruct the jury of the limited purpose of the evidence both at the time of its receipt and in the charge. The court cautioned in its instructions that "while that evidence [of Barbara Jiminez' death] was part of this case, your only determination will be as to the death of Michael Jiminez." Defense counsel did not request more specific instructions and is therefore precluded from raising the issue here.

It is undisputed that California authorities knew that Michael Jiminez had been killed by a gunshot and that his wife's body had also been found. In addition, they were aware of certain facts connecting defendant to the crime. They knew that the inscribed pens found near Michael's body were identical to ones given to defendant by his employer; that typewriter rental receipts bearing defendant's name were found in a box with items belonging to the Jiminezes a few miles from the bodies; that a man meeting defendant's description kept a rifle in the room he occupied while staying with the Wards; and that defendant had driven from California to Michigan at a time that would have brought him into contact with the Jiminezes. It was reasonable for the arresting officers, based upon this evidence, to conclude that defendant was responsible for the murders. The arrest having been lawful, the search which disclosed the receipt for the rental of the storage shelter was proper.

Defendant also argues that the information upon which a California magistrate issued a warrant to search defendant's vehicle and storage shelter was insufficient to support a finding of probable cause. The affidavit submitted to the court recited the evidence noted above as justifying the arrest and, in addition, reported an interview with defendant's in-laws, who lived in the Sacramento area. Defendant's in-laws told the police that defendant had stayed with them in March, that he had returned to Michigan in late April, that he had again arrived in California on May 4, 1974, that they had helped him move his belongings into a rented storage shelter, and that to the best of their knowledge defendant was living out of his Bronco. Police also verified that defendant had rented a storage shelter. This evidence was clearly sufficient to lead a reasonably prudent man to believe that there was a basis for the search, since it tied the vehicle to the scene of the crime and the storage shelter to items found in the vehicle. *State v. Suess*, 280 Minn. 308, 159 N.W.2d 180 (1968).

Defendant further contends that he was denied due process of law by the state's failure to produce the following four items of exculpatory evidence. First, the state introduced evidence that latent fingerprints on defendant's vehicle could not be matched with those of Barbara Jiminez because her fingers were too badly decomposed to allow classification. The undisclosed report states that Barbara's fingerprints were classified but that positive identification of the latent prints could not be made. Second, Ed Newberg, a Michigan resident, gave a written statement to police, which was not disclosed to defense counsel. Newberg first stated that he had seen defendant in Michigan on either the 21st or 28th of April but later said that he remembered it was the 28th. He also stated that defendant's Bronco was a 1967 model. Third, at trial a waitress testified that she served the Jiminez couple lunch on April 22 in Blairsberg Corners, Iowa. An undisclosed police report indicated that a service station attendant at the truckstop adjacent to the cafe stated that he had seen the couple but that he did not recall seeing defendant or the Bronco. Fourth, an undisclosed police interview with Glen Bjorkland, owner of a service station located in Alden, Minnesota, a small town 40 to 50 miles southwest of where Michael's body was found, established that Bjorkland filled the gas tank of a brown Bronco with Michigan license plates sometime near 7:30 to 8 p. m. on a day in the latter part of April. Bjorkland stated that the driver of the vehicle was alone but his identification of defendant was equivocal.

A prosecutor must volunteer exculpatory matters to the defense under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when that evidence is "material" though only a general request, or no request at all, for the information has been made. In *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976), the United States Supreme Court stated the standard for a new trial when no disclosure is made:

The proper standard of materiality must reflect our overriding concern with

the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt. [Footnotes omitted.]

In our view, none of this evidence raises a reasonable doubt about defendant's guilt. First, classification of fingerprints does not alone enable a conclusive determination whether latent prints match those classified. Thus, the information contained in the report does not suggest the presence of a third person and is not exculpatory. Second, the statement of Ed Newberg, to the extent that it places defendant in Michigan on April 21, is inconsistent with all evidence, including that supporting the defense theory. Moreover, with regard to Newberg's improperly admitted testimony concerning theft of the Bronco, the impeachment value of the statement that defendant's Bronco was a 1967 model was limited since the implication would have been that Newberg originally attempted to cover for defendant. Third, the exculpatory value of the service station attendant's statement is speculative. The critical aspect of the testimony of the waitress is the date and time she saw the Jiminez couple. The attendant's statement does not specify either a date or time, and his testimony could have been inculpatory if he placed the couple in Iowa on the 21st. Fourth, Bjorkland's statement is equivocal. He did not positively identify defendant. In addition his facts are not inconsistent with the state's theory, since defendant could have already committed the murders before arriving at the station in Alden.

Defendant next argues that prosecutorial misconduct in final argument deprived him of due process of law. A prosecutor's closing argument should be based on the evidence and inferences reasonably drawn therefrom. It should not be calculated to inflame the passions and prejudices of the jury against the defendant. *State v. Perry*, 274 Minn. 1, 142 N.W.2d 573 (1966). In addition, a prosecutor should not express his personal opinion as to a defendant's guilt. *State v. Schwartz*, 266 Minn. 104, 122 N.W.2d 769 (1963). Defendant argues that the prosecutor's remarks stressing Barbara Jiminez' beauty were geared to divert the minds of the jurors from the facts of Michael's death to the highly emotional subject of the murder and possible rape of an attractive young woman. Defendant also contends that references to him as a "master liar" and a "confirmed liar" were improper expressions of personal opinion. While we agree that the prosecutor's statements constituted misconduct, two factors persuade us that reversal and a new trial are not required. First, defense counsel did not object to the challenged remarks. Second, in light of the strong evidence of guilt we cannot conclude that the error likely played a substantial role in influencing the jury to convict. *State v. Caron*, 300 Minn. 123, 218 N.W.2d 197 (1974).

Defendant further contends that the evidence was insufficient to justify a jury verdict of guilty of first-degree murder. Viewing the evidence in the light most favorable to the verdict, we must determine whether the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that defendant was proven guilty of the crime charged. *State v. Swain*, 269 N.W.2d 707 (Minn.1978). When a conviction is based solely on circumstantial evidence, as this one was, the circumstances proved must be consistent with the hypothesis of guilt and inconsistent with any other rational hypothesis. *State v. Diamond*, 308 Minn. 444, 241 N.W.2d 95 (1976).

■ Defendant acknowledges the extensive circumstantial evidence connecting him to the murders but argues that his alibi provides a rational explanation for that evidence inconsistent with guilt. Defendant first argues that the evidence that he made a phone call in Illinois prior to the time of Michael's death, as determined by the pathologist, requires the conclusion that he could not have committed the murder. The jury could, however, have determined that Michael died earlier, especially in view of the fact that the murder weapon was subsequently found in defendant's possession. They could also have discredited the telephone-call evidence. Defendant next argues that his testimony that there were three hitchhikers requires reversal. To accept defendant's alibi, the jurors would have had to believe that the third hitchhiker commandeered the Bronco without threat or violence and drove on Interstate 35, instead of 80, without defendant's learning of the change in direction even during a stop when he cashed a traveler's check; that the third hitchhiker shot Michael, strangled Barbara, and left various items of defendant's near the bodies, while defendant slept soundly; and that the third hitchhiker abandoned the Bronco without leaving a trace of himself and without harming defendant, the only person who could identify him. This inherently incredible alibi is not a proved circumstance inconsistent with guilt, and the jury was reasonable in its conclusion that defendant was proven guilty.

Defendant raises various other issues on appeal, which we have considered and find to be without merit.

Affirmed.