Jimmy Edward LAUGHNAN,
Petitioner, Appellant,

v.

STATE of Minnesota, Respondent.

No. C1–86–1722.

Court of Appeals of Minnesota.

April 21, 1987.

Review Denied June 9, 1987.

C. Paul Jones, State Public Defender, Ann Remington, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Richard M. Arney, Co. Atty., Fred A. Fink, Jr., Asst. Co. Atty., Washington County Government Ctr., Stillwater, for respondent.

Considered and decided by FORSBERG, P.J., and RANDALL and STONE,* JJ., with oral argument waived.

## OPINION

FORSBERG, Judge.

On April 2, 1985, appellant was charged by complaint filed in Washington County with theft by false representation over $2,500, Count I, and attempted theft by false representation over $2,500, Count II, as a result of incidents allegedly occurring from March 3–15, 1985. A jury trial from August 12–21, 1985, in Washington County resulted in a verdict of guilty on both counts. Appellant was sentenced to double the presumptive sentence with credit for time served since the filing of the complaint.

Appellant sought and was denied postconviction relief. We affirm.

## FACTS

Upon his release from prison in January 1985, appellant shared a trailer in a mobile home park in Oakdale, Minnesota with Elizabeth Langro, a girlfriend of a man appellant had met in prison, and Ron Bromenschenkel, another friend appellant had met in prison. Appellant worked as a sales manager at a Photo Mart in Fridley, where Langro had also worked until February of 1985.

At trial, Langro testified that on February 28, 1985, appellant called her at home from his office, and told her he had come across some checks worth a lot of money. Appellant told Langro he didn't want to talk about it over the phone and asked her to come to the office. At the Photo Mart,

appellant showed Langro three checks made payable to A–J Industries totalling over $30,000. The A–J Industries offices were in the same industrial office area as Photo Mart. Appellant first told Langro that he got the checks when the mail was misdelivered, but later told her he had stolen them from the mails.

Langro testified that appellant suggested they open a business account under the A–J Industries name, deposit the checks, and make withdrawals from the account. Langro and appellant decided to open an account at Norwest Bank Stillwater, where Langro had a personal account. Langro phoned the bank and found out she needed a tax identification number to open a business account, so appellant gave her his altered social security number. Langro then borrowed appellant's car and went to the bank, wearing a wig and sunglasses and using a fake New York driver's license she had in the name of Donna Boothe. Appellant did not accompany Langro because he did not want to be recognized by Bill Blackburn, a Norwest employee.

At the bank, Langro met with Blackburn and opened a business account. Langro told Blackburn she was a secretary for A–J Industries, a company owned by her father Joseph Boothe and her uncle Allen Boothe. Langro endorsed and deposited three checks made payable to A–J Industries.

Langro then changed and drove to the Photo Mart, where she gave appellant the blue Norwest deposit ticket. Appellant signed the corporate signature card in the name of Joseph Boothe, and Langro signed the name Allen Boothe to the card. Langro said she and appellant then planned to withdraw and split $11,600.

Appellant denied receiving checks made payable to A–J Industries, giving the checks to Langro, or designing a plan to open an account with the checks. Appellant denied loaning his car to Langro on February 28, 1985. Appellant testified that on that date Ron Bromenschenkel had his car from noon until 4:00 p.m.

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

Langro testified further that on the morning of March 6, 1985, appellant drove her to the bank in a friend's car. Langro withdrew $11,600 in cash, received temporary checks, and ordered checks to be printed. Appellant again declined to enter the bank for fear of being recognized by Blackburn. Langro testified that at this time they split the money and planned the next withdrawals.

Appellant denied driving Langro to the bank on March 6th. He stated that he was at the Photo Mart all day and had called in a breakfast order at McDonald's at 10:30 a.m. Appellant remembered having breakfast with some other employees, and having a late lunch with Cathy Bowman. Bowman recalled phoning in a breakfast order for appellant during the week of March 4th, but could not say for certain on which day.

Langro testified that on March 7th Robert LaValle drove her to the bank where she withdrew another $8,600 from the account, $2,800 in cash and $5,800 in a cashier's check. LaValle confirmed that he had driven Langro, who was dressed in a wig and sunglasses, to the bank during the week of March 4th. Langro testified further that later that afternoon appellant drove her to Norwest's downtown branch, where she endorsed and cashed the cashier's check. Appellant and Langro then split all the money.

Appellant testified that he was at his office all day on March 7th. A Photo Mart employee testified that he was at a lunch meeting with appellant on March 7th, but could not recall the time. Another employee testified that he met with appellant from 2–5:00 p.m., but couldn't recall if it was on the 6th, 7th or 8th of March.

On March 8th, appellant and Cathy Bowman flew to Las Vegas. Appellant paid for Bowman's airfare, hotel and meals, and gave her $200 spending money.

Langro testified that on March 10th appellant phoned her from Las Vegas and asked her to wire him $3,000 to finance a cocaine deal. Langro wired $3,000 to appellant, expecting to be repaid upon his return. Appellant lost $4,000 gambling in Vegas and returned to Minnesota on March 13th. Langro was upset to learn appellant had lost her money, and the two fought. Appellant agreed to pay her back the money, and asked Langro to move out the next day.

On March 14, 1985, appellant rented a White Thunderbird. Appellant rented the car in his own name and stated that he needed the car so he could take his own car in for repair. Appellant never brought his own car in for repair.

Meanwhile, the bank had received the printed checks for the account and Blackburn tried to call Donna Boothe to let her know they were ready. When Blackburn failed to reach Boothe at the number she had provided, he called information and got the number for A–J Industries. The person who answered told Blackburn that no Donna Boothe worked there and that the company's owners were not Joseph or Allen Boothe. Blackburn immediately placed a lock on the A–J Industries account.

Langro testified that on the morning of March 15, 1985, appellant called the bank to see how much money was left in the account and if the account was still good. Appellant and Langro drove to the bank that afternoon to withdraw $7,100. Appellant waited in the car in the parking lot while Langro, in her wig and sunglasses, went into the bank and attempted to cash a check for $7,100. When Blackburn confronted Langro about the discrepancy with the phone number and the information he'd received, Langro told him that the manager was in the car, and that she would go get him to clear up the matter. She left the $7,100 check and went to a white Thunderbird in the lot, and took off. Blackburn was able to give a description of the car and a license number to the police. Blackburn told police he saw a white male driving, and at trial identified appellant as the driver.

When Langro got in the car she told appellant to leave. Believing the license number had been seen, appellant told Langro he'd tell the police he'd lent the car to a friend. The two drove for a while, going over to Wisconsin for a time, and then

decided they should move out of the trailer immediately. While driving around, Langro threw her wig and sunglasses out of the car. The two then returned to the trailer and loaded up their own cars with suitcases. Langro tore up the phony Donna Boothe identification and threw it in the trash. Appellant left the Thunderbird parked by the garbage area at the trailer park. As they were leaving, they saw police enter the park.

Kenneth Vanderwyst, a resident of the trailer park, testified that on March 15th he observed a White Thunderbird drive into the trailer park, through a stop sign, and park next to the garbage area. Vanderwyst saw appellant and a woman exit the car and enter appellant's trailer. Vanderwyst later saw the two loading suitcases into a blue GM car and appellant's car and leave. As they were leaving, Vanderwyst observed the two cars pull into a one-way street the wrong way, stop, back out after a police car had passed them, and then leave at a high rate of speed.

Langro and appellant drove to the Photo Mart office where appellant told Cathy Bowman and another Photo Mart employee to say he had been in the office all day if anyone were to ask them. Appellant then drove Langro to a motel, paid cash for the room and returned to the office. Langro subsequently went back to the trailer, and when she saw police cars there, drove to Somerset, Wisconsin and spent the night.

Appellant testified that on March 15th he drove Langro to the bank, but did not know she was withdrawing money from a phony account. Appellant said he was not suspicious, even though Langro wore a wig and sunglasses, because he had seen her wear them before. Appellant testified that after Langro had been in the bank for 15 minutes, she came out, looking over her shoulder. Appellant then drove to the post office, and when he came out, Langro had taken off her wig and sunglasses and was acting paranoid. Appellant said that on the way back to the trailer, Langro told him what she'd done at the bank. Appellant said he was angry, and because he was scared, he parked the Thunderbird by the garbage instead of in front of the trailer while he helped Langro move her things out.

On March 15, 1985, police executed a search warrant at appellant's trailer. In the bags of garbage they confiscated they found a blue Norwest deposit slip for $30,056.54, a receipt for a $5,800 cashier's check dated March 7, 1985, and a torn New York driver's license in the name of Donna Boothe.

On March 16, 1985, Bromenschenkel told appellant police had searched the trailer, leaving behind a copy of the search warrant, and impounding the rented Thunderbird. Appellant called and told the dispatcher that he had loaned the Thunderbird to Langro, but admitted at trial that this wasn't true.

On March 18, 1985, appellant called Officer Ulrich and agreed to meet him at the Stillwater Police Department. At their meeting, appellant told Ulrich that his car had been parked at the office all weekend. He never admitted driving the Thunderbird, but said that he had lent it to Langro. Appellant told Ulrich that Langro fit the description of Donna Boothe and that they should go after her. Appellant was then placed in custody by his parole agent for an unrelated parole violation.

Police picked up Langro on March 20, 1985, and subsequently charged her with theft by fraud over $2,500 and attempted theft by fraud over $2,500. Langro pleaded guilty to Count I on April 8, 1985. At that time Count II was dismissed. As part of the plea agreement, upon completion of her testimony against appellant, Langro was to receive a stayed sentence and 10 years probation.

Appellant was convicted following a jury trial in Washington County District Court of theft by false representation over $2,500 and attempted theft by false representation over $2,500. The court imposed a durational departure as a major economic offense and sentenced appellant to a term of 58 months for Count I, double the presumptive sentence of 29 months for a Severity Level III offense and an offender with a criminal history score of 6 or more.

Appellant sought post-conviction relief. The trial court denied appellant's motions for reversal of his conviction, for a new trial, and for a sentence reduction. Appellant's motion for additional jail credit was granted in part, and he was given credit for time served since the filing of the complaint in this matter.

## ISSUES

1. Did the trial court err by allowing appellant to be impeached by use of his prior felony convictions?

2. Did the trial court err by restricting cross-examination of Elizabeth Langro?

3. Was there prosecutorial misconduct denying appellant his right to a fair trial?

4. Did the trial court err in sentencing by imposing a durational departure, and denying appellant credit for time served on an unrelated offense?

## ANALYSIS

1. Appellant argues that the trial court erred by allowing the State to impeach him with his prior felonies. Minn.R.Evid. 609(a) provides that evidence that a witness has been convicted of a crime may be admitted to attack the credibility of that witness if the crime:

1. was punishable by death or imprisonment in excess of one year under the law under which he was convicted and the court determines that the probative value of admitting the evidence outweighs its prejudicial effect, or

2. involved dishonesty or false statement, regardless of the punishment.

Here, the trial court allowed the State to impeach appellant with all 12 of his prior felonies, eight forgeries, one robbery, two escapes, and one burglary.

Appellant argues that allowing introduction of all nine convictions for forgery was cumulative and prejudicial and should have been excluded under Minn.R. Evid. 403. This argument does not withstand analysis. Rule 609 divides convictions into two different types, and crimes directly involving dishonesty or false statement are automatically admissible without

regard to the seriousness of the punishment and without balancing probative value against prejudice. *State v. Bettin*, 295 N.W.2d 542, 545 (Minn.1980).

While the forgery and burglary convictions were properly admitted, appellant's objections to admission of the two escape convictions is well taken. Under Rule 609, the trial court has considerable discretion in deciding whether to restrict the use of a conviction which does not directly involve dishonesty or false statement. *State v. Bowser*, 307 N.W.2d 778, 779 (Minn.1981). In determining whether to restrict the use of such a conviction, the court should consider the factors as enumerated in *State v. Jones*, 271 N.W.2d 534, 537–38 (Minn.1978). These factors are also considered on appeal in determining whether the trial court erred in the exercise of its discretion. *Bowser*, 307 N.W.2d at 779.

We believe the trial court improperly admitted the escape convictions. The convictions were relatively remote in time, had no similarity to the crime charged, and had no probative value. *See Jones*, 271 N.W.2d at 537–38. Nevertheless, in light of the proper admission of appellant's ten other convictions, and the strong evidence supporting appellant's conviction, admission of the two escape convictions did not amount to prejudicial error.

2. Before Langro testified, appellant moved the trial court to allow evidence regarding Langro's alleged plan to break her boyfriend out of prison. Appellant attempted to admit evidence seized from Langro, including helicopter rental receipts, wigs, false identification cards, bolt cutters and balloons. Appellant argued that this evidence was related to Langro's motive in testifying against appellant (to cooperate with the State to avoid an investigation and/or charges relating to the planned prison break, and to get back at appellant for his refusal to help Langro with the escape) and was evidence of prior misconduct admissible as proof of a common scheme or plan (the defense theory at trial was that Langro planned and implemented the Norwest scheme in order to

finance her boyfriend's prison break). The trial court ruled that evidence of Langro's prison break plan was too collateral and more prejudicial than probative, and prohibited cross-examination in that area. Appellant argues that in so ruling, the trial court deprived him of his constitutional right of confrontation. We agree.

The sixth amendment guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). The right of cross-examination is one of the primary interests secured by the confrontation clause. *Id.* at 315, 94 S.Ct. at 1109.

The importance of this right is nowhere better illustrated than here, where the State's case relied heavily on accomplice testimony directly contradicting defense testimony. Exposure of a witness' motivation in testifying has been identified as a proper and important function of the constitutionally protected right of cross-examination. *Id., Greene v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959). Here, appellant was denied his right to discredit the primary witness against him. Considering the strong evidence of appellant's guilt and the substantial circumstantial evidence corroborating Langro's testimony, denial of appellant's right to cross-examine Langro about her prison break plans was harmless error.

3. Appellant contends that prosecutorial misconduct in closing argument resulted in the denial of a fair trial. Specifically, appellant objects to statements wherein the prosecutor called appellant a liar and suggested that he had concocted his entire alibi, referred to appellant as a "sugar daddy" and stated: "Well, we know the defendant certainly has an interest in the outcome of the case. You can imagine what's going to happen to him if he's found guilty." These comments were clearly improper. *See State v. Parker,* 353 N.W.2d 122, 127–28 (Minn.1984); *State v. Clark,* 296 N.W.2d 359, 371 (Minn.1980).

However, because appellant failed to object or seek curative instructions, and in light of the substantial evidence against him, we conclude that the misconduct in this case was harmless. *See, e.g., State v. Brown,* 348 N.W.2d 743, 747 (Minn.1984); *State v. Marquetti,* 322 N.W.2d 316, 318 (Minn.1982); *State v. Caron,* 300 Minn. 123, 127, 218 N.W.2d 197, 200 (1974).

4. Appellant challenges the treatment of the crime charged as a major economic offense and the trial court's refusal to grant him credit for time served in custody in connection with an unrelated parole violation prior to being charged with the present offense. We are satisfied with the trial court's assessment of the crime committed here as a major economic offense justifying departure. Minn. Sentencing Guidelines II.D.2.b.(4). In addition, appellant was given credit for all time spent in custody in connection with the offense for which sentence was imposed, and was not entitled to more. Minn.R.Crim.P. 27.-03, subd. 4(B).

We have reviewed the additional issues raised by appellant, including insufficiency of the evidence and ineffective assistance of counsel, and find them to be without merit.

## DECISION

It was not prejudicial error for the trial court to admit appellant's two escape convictions, in light of the other properly admitted convictions and the substantial evidence supporting appellant's conviction.

Denial of appellant's right to confrontation by limiting cross-examination of an accomplice was harmless error because other evidence of appellant's guilt was strong and there was substantial evidence supporting the witness' testimony.

Prosecutorial misconduct in the nature of remarks made in closing argument, which were not objected to, was harmless.

Sentencing as a major economic offense and taking into account all time spent in custody in connection with the offense was not error.

Affirmed.