## STATE v. WILLIAM PERRY.

142 N. W. (2d) 573.

April 22, 1966—No. 39,201.

*Thomas E. Moore,* for appellant.

*Robert W. Mattson,* Attorney General, *William B. Randall,* County Attorney, and *Henry W. Pickett, Jr.,* Assistant County Attorney, for respondent.

THOMAS GALLAGHER, JUSTICE.

On April 9, 1963, defendant was convicted by a jury of murder in the third degree under Minn. St. 609.195 (L. 1963, c. 753, § 609.195).[1] This appeal is from an order denying his motion for judgment of acquittal notwithstanding the verdict or, in the alternative, for a new trial. He contends that it was agreed between the county attorney and his counsel that if he would submit to a lie detector test the results would not be used in evidence against him and that in violation of this agreement, and over objection, evidence was received with reference to such test which permitted the jury to learn that it had been conducted. He also contends that statements made by the assistant county attorney in his final argument to the jury were extraneous to the evidence submitted and were intended to and did inflame the passion and prejudice of the jury against him at the cost of justice.

The case arose out of a robbery and shooting in St. Paul which occurred about 11:30 p. m. November 21, 1962. On the afternoon of that day, one Gregory Goben had visited defendant at his home where he and defendant had consumed a substantial amount of intoxicants. During the visit a .22 caliber pistol owned by a half brother of defendant was examined and fired several times at targets in defendant's home. Later that evening the two left in an automobile belonging to defendant's stepfather and driven by Goben. Goben then took with him the .22 caliber pistol, but, according to defendant, without defendant's

---

[1] Minn. St. 609.195 provides: "Whoever, without intent to effect the death of any person, causes the death of another by either of the following means, is guilty of murder in the third degree and may be sentenced to imprisonment for not more than 25 years:

"(1) Perpetrates an act eminently dangerous to others and evincing a depraved mind, regardless of human life; or

"(2) Commits or attempts to commit a felony upon or affecting the person whose death was caused or another, except rape or sodomy with force or violence within the meaning of section 609.185."

knowledge. They visited several bars in downtown St. Paul where they continued to drink intoxicants. At one of these bars they met Richard Vierkandt, a friend, and about 10:50 p. m. all three left to give Vierkandt a ride to his residence. As they proceeded on this trip, they stopped for gasoline at a Clark gasoline station on the northeast corner of Seventh Street and Sherman Street.

After purchasing the gasoline they traveled north one block to Smith Street where Goben parked the car. Vierkandt testified that at this point Goben left the car saying, "I am going to rob the man," but that he, Vierkandt, was not sure that this statement had been heard by defendant. He testified further that he and Goben then walked back toward the Clark station while defendant remained in the car; that at that time he persuaded Goben not to rob the station; that they then returned to the car and that Goben then drove around the block and stopped again, this time between Seventh and Smith Streets where Goben again left the car saying, "Come on, Bill" (referring to defendant); that defendant had then left the car and started to walk back toward the station with Goben; that he was not sure whether defendant knew that Goben intended to rob the station at that time and did not know how far defendant had accompanied Goben toward the station; that when he next saw them they were some 35 to 40 feet away from the car. Vierkandt further testified that he had not left the vicinity of the car at any time and that he did not participate in the robbery in any respect; that following the robbery he had driven the car and that eventually they had stopped near Renaldo's Barbecue Cafe on Rondo Street between Dale and St. Albans Streets (where the car was located by police at about 2:05 a. m. the following morning and Goben and defendant had then been arrested); that at no time prior to the robbery had he seen Goben show the gun to defendant and that at no time had he seen any "split" of money between Goben and defendant nor heard any conversations with reference thereto.

Louis Sirian testified that at about 11:30 p. m. on that day he was traveling west on Seventh Street and that as he passed the Clark station referred to he saw two or three people scuffling there; that he then thought they might "have been playing a game; could have been fight-

ing"; that he then drove around the block and that when he came back to the service station he saw someone on the ground; that he had then turned north on Sherman Street and had observed a car parked there on the east side with one person in it and two getting into it and that he had then procured the car's license number and called the police, giving them all this information. It is undisputed that the car observed by Sirian was the car owned by defendant's stepfather in which defendant, Goben, and Vierkandt had been traveling. Likewise, there is no dispute that at 11:30 p. m. Goben robbed the Clark station attendant and shot him with the .22 caliber pistol described and that the attendant died a short time later from the wounds inflicted at that time.

Two customers at Renaldo's testified that they had there observed defendant and Goben handing a gun back and forth. The owner of Renaldo's testified that defendant and Goben were together as they came into the restaurant. An employee of the restaurant testified that Goben had given him a package to keep until Goben was ready to leave; that Goben had not asked for this package again and that it contained a .22 caliber pistol which was turned over to the police.

Goben later pleaded guilty to the crime and was sentenced to St. Cloud Reformatory. At defendant's trial he testified that defendant had not been with him at the time of the robbery and shooting but had remained outside.

Defendant testified that he was unaware that Goben had taken the revolver with him when they left defendant's home and that he had not seen it again until the parties came into Renaldo's restaurant; that he had never given Goben permission to take the gun from his home; that after the gasoline had been purchased at the Clark station the car had been parked on Smith Street off Sherman Street and that Goben and Vierkandt had first left it while he remained in it; that at no time had he heard anyone say anything about a robbery and that they had returned to the car in about 5 minutes; that with Goben driving they had then driven around the block and parked on Sherman Street; that all three of them had been seated in the front seat of the car with defendant to the right of the others; that they had parked adjacent to the north wall of a building near the station and on the opposite side of the

street; that after they had parked there Goben had said, "Come on, Bill," as he left the car; that he had left the car to find out what Goben wanted him for; that he had then walked around to the back of the car when Goben said, "I have some business to take care of at the station," and that he had replied, "You just came back from the station"; that Goben had then said, "I need some money. I am going to rob the kid"; and that defendant had then said, "Johnny, you are crazy"; "The whiskey is talking to me, not you. You are going to do something you are going to hurt yourself. You will always regret it"; "Forget it. Forget about the whole thing. Count me out on anything if you want to pull something like that"; that as they had this conversation they were walking toward the station and that he had then turned around and walked back to the car; that at no time did he know that Goben had the gun with him; and that at no time had he been close enough to see the filling station office; that when he returned to the car he observed Vierkandt bending over from the front seat; that he next noticed Goben walking or running back toward the car and heard him say, "Come on, Bill. I had to shoot the guy"; that he had then followed Goben into the front seat of the car, where he had asked, "Do you think you killed the kid?" and that Goben had replied, "No." "I shot him twice in the side, and he asked me, 'What did you hit me with?'"

He testified further that from the time the car first left the station he had not seen the attendant; that at no time had he heard the report of the .22 pistol; that he had never seen anyone shoot another person but would "expect an emotional upheaval, remorse, or something"; that there was nothing like this from Goben; and that from all the circumstances he thought that perhaps there had been no robbery. He denied receiving anything from Goben and testified that Vierkandt had then driven the car until they had come to Renaldo's about 12:30 a. m.; that when he was arrested there by police officers he was not advised as to why he was being arrested; and that he had assumed it was because he had just been in a fight with a customer there.

Prior to trial defendant's counsel agreed with counsel for the state that defendant would submit to a lie detector test by police officers at the University of Minnesota with the understanding that its results

would not be submitted in evidence. During the trial the state called Arthur G. Kirby who testified that he was a lieutenant in the Department of Police at the University of Minnesota; that he had taken part in the investigation of the death of the station attendant; and that he had spoken with the defendant at his office at the university on February 5, 1963. His testimony included the following:

"Q. Did he relate to you whether or not he was on the scene on November 21, 1962, * * * at the time Arthur Robert Walters was shot?

"A. Yes, sir."

Defendant's counsel objected to this procedure and the following then took place:

"MR. MOORE: * * * The question is objected to * * * on the grounds it is prejudicial * * * on the grounds of privileged communication.

\* \* \* \* \*

"THE COURT: I shouldn't consider it grounds for objection as it might be prejudicial.

"MR. MOORE: It is if the Court were aware of the background, I am sure he would feel it would be.

\* \* \* \* \*

"THE COURT: If you want to raise some question that doesn't appear from the record, I will permit you to ask the witness some questions.

"MR. MOORE: Do you wish me to get it into the record?

"THE COURT: I don't know what you are talking about.

"MR. MOORE: You had him over for a lie detector test, didn't you? Isn't that right, Mr. Kirby; for a lie detector, isn't that right?

\* \* \* \* \*

"MR. RANUM: I object to this question * * * based on the grounds that I have only asked Mr. Kirby whether or not he talked with Mr. Perry.

"THE COURT: No, you haven't. You practically asked what he said.

\* \* \* \* \*

"MR. RANUM: I object to the questioning of Mr. Moore concerning anything — concerning any lie detector.

"THE COURT: All right.

"MR. RANUM: — which is purely inadmissible in any court.

\* \* \* \* \*

"THE COURT: Overruled.

"MR. MOORE: He was there for a lie detector test, is that right, Mr. Kirby?

"A.   Yes, sir.

"MR. MOORE: Your Honor, defendant moves for a mistrial on the basis of what Mr. Ranum said, no admission allowed in any courtroom regarding any polygraph or lie detector.

"THE COURT: There certainly isn't. You must know that.

"MR. RANUM: Concerning any such examination, this is no inquiry of mine, your Honor. \* \* \*

"THE COURT: There is nothing in the record at this time that will require a mistrial, so far.

"Q.   (By Mr. Ranum, continuing) [to witness] What did Mr. Perry tell you?

\* \* \* \* \*

"MR. MOORE: You are relating now the conversation you had with Mr. Perry at your Police Headquarters?

"A.   Yes, sir.

"MR. MOORE: And part of your conversation you had with Mr. Perry was a lie detector test, is that right?

"A.   Part of it, yes, sir.

\* \* \* \* \*

"MR. MOORE: Again, your Honor, defendant would move for a mistrial.

"MR. RANUM: Your Honor, the question I am asking \* \* \* is not in connection with the test, any result of it. I am asking only what he said.

\* \* \* \* \*

"MR. RANUM: It is the position of the State \* \* \* all admissions

to anyone as concerns this crime, are admissible \* \* \*. I am not talking about the results of any examination such as Mr. Moore alludes to.

\* \* \* \* \*

"Q. (By Mr. Ranum, continuing) Did you talk with Mr. Perry at the time and place you have indicated?

"A. Yes, sir, I did.

\* \* \* \* \*

"Q. Did he relate to you in the narrative concerning this incident about which you were inquiring?

"A. Yes, sir, he did.

"Q. And did you ask him whether or not he had been at the scene \* \* \* when Arthur Walters was shot and killed?

"MR. MOORE: I am going to object further on the basis previously given.

"THE COURT: I sustain the objection on the grounds the only thing we are interested in right now is whether these conversations were part of the lie detector test. That is the thing you will have to go into before I will allow testimony at this time.

"Q. (By Mr. Ranum, continuing) The conversations you are relating now, are they part of the test, the lie detector test?

\* \* \* \* \*

"A. There is a pretest interview with each subject, sir, and the pretest interview I had with Mr. Perry did concern questions concerning the alleged holdup and shooting of Mr. Walters. This was previous to any test.

\* \* \* \* \*

"MR. MOORE: Is there any question in your mind before a lie detector test is given there is pretest questioning?

"A. No, sir.

\* \* \* \* \*

"THE COURT: We will get along much better if you try to find out what occurred, not what was said; what happened that this conversation

occurred; whether it is part of the test, whether the machine is being used, various things that go into that.

"Q. (By Mr. Ranum, continuing) Was there any machine being used at the time of this interview?

"A. No, sir.

"Q. What did Mr. Perry tell to you —

"MR. MOORE: Objected to as no proper foundation.

"Q. — concerning this incident?

"MR. MOORE: Prejudicial.

\* \* \* \* \*

"Q. (By Mr. Ranum, continuing) It is necessary, sir, and good practice in the giving of a polygraph test, that, prior to actually putting on the instruments, you have a pretest interview \* \* \*?

"A. Correct, sir.

"MR. MOORE: Objected to, your Honor, on the privilege of the testimony.

"THE COURT: Overruled, insofar as the conversation relates to conversations that were not held while the lie detector machine was being held.

"Q. (By Mr. Ranum, continuing) Would you so relate, Mr. Kirby, what did Mr. Perry tell you?"

Subsequently the court and counsel retired to chambers and as a result of the conference there the court ruled as follows:

"The main question is the defendant has made a motion for a mistrial regarding the misconduct of the County Attorney in presenting evidence which inevitably lead to the jury knowing a lie detector test had been taken. I am going to sustain the objection to the submission of the test. Because we have gone so far I hesitate to declare a mistrial. If this had occurred earlier in the trial, I would have done it without question, but I deny the motion for a mistrial. I am going to inform the jury that the courts do not permit any testimony as to the results of a lie detector examination by either side, and the Court would not permit either the State or the defendant to introduce any evidence or authority on this test.

"MR. RANUM: Does this include the interview previous to testing?

"THE COURT: Yes, sir, everything connected with the test. Obviously it is privileged. The Court is satisfied that it was made under the understanding it wasn't to be used in evidence. I am satisfied.

*   *   *   *   *

"MR. MOORE: We will renew it [motion for mistrial].

"THE COURT: The Court denies it. You certainly can raise that question on a motion for a new trial if there should be a conviction, and in the Court's present state of mind, I tell you I am giving very serious consideration to such a motion too. I am not happy with this attempt to get before the jury the fact there has been a lie detector test."

Upon return to the courtroom, the court instructed the jury as follows:

"The Court * * * is satisfied that the interview held with this witness and the defendant was made pursuant to an agreement between the defendant and his counsel and the State that he would take a lie detector test, but that there was an agreement that nothing divulged in that test would be admissible in evidence. The Court is sustaining the objection with respect to the motion of the defendant for mistrial on the grounds of misconduct of the County Attorney in introducing evidence which would inevitably and necessarily lead to informing the jury that a lie detector test was made. The Court is very much in doubt. However, the Court will deny the motion for mistrial at this time, but he must inform the jury that the courts of this state or no other state in the Union give any credit to the results of the so-called lie detector test. The courts have uniformly held they are unreliable; they do not allow admission in evidence by either side of the results of a lie detector test. It is improper to even refer to the fact one has been taken during the trial. * * * I ask the jury to completely dismiss from your minds anything about any lie detector test * * * you must not draw any inferences either way as to what that thing may have shown. It has been demonstrated time and again they are not reliable. On that I will deny the motion for mistrial at this time.

*   *   *   *   *

"MR. RANUM: Objection to the ruling.

"THE COURT: You want to inform the jury you don't agree with the Court's ruling. I think you had better be seated.

"MR. RANUM: Yes, we do not agree with the Court's ruling.

"THE COURT: You go a little bit further, and this case is going to be out. Conduct yourself like an officer of the court and gentleman here, or the Court will take it out."

In addition to the foregoing as a basis for a new trial, defendant urges that counsel for the state was guilty of misconduct in various statements made by him in his final argument to the jury. These include the following:

"* * * This whole thing, the whole burden of this whole affair, is carried by taxpayers, the court room, you people as jurors, the Judge, myself, Mr. Moore, the court officers, the bailiff, everyone. This is a solely supported tax function. * * *

* * * * *

"* * * A big crime here in St. Paul, downtown almost, right in broad light. * * * None of us are safe until we take care of these people who will rob, who kill, murder, steal. * * *

* * * * *

"* * * Arthur Robert Walters was done the greatest injustice. He is not a pretty sight as he lies on the slab * * *. You people work. You work at your jobs. You raise your family. * * * Perry — he doesn't work. He prowls at night like he was doing — downtown drinking from early afternoon until late in the night; carrying this gun; target practicing in his house. * * * When Arthur Robert Walters was lying on that pavement dying, and he said, 'Did you kill him?' what did this good citizen do? * * * He went up to Elmer's and started to consume some more liquor and pursued his particular indulgence at that time. This is not the class-A citizen who is deserving of any consideration from people on the jury. You have got one right here in the palm of your hands * * *. You have got Goben and we have got Perry. * * * A fifteen or sixteen dollar murder in this case, and here you have got

one right in the palm of your hand. I suppose some of you wondered what a murderer looks like until you saw Mr. Goben. He looks like everybody else * * * so now you know what a murderer looks like; but we also have Mr. Perry — Mr. Perry who claims he is in a ticklish position but now really didn't have anything to do with it."

At the close of the argument counsel for defendant stated:

"* * * [D]efendant objects to the portion of the State's argument as prejudicial * * *. * * * 'None of us are safe until we take care of those who maraud, murder, kill, and steal.' * * * 'Perry and Goben lead a life different from us, a life of crime' * * *. * * * 'He is the type person that prowls at night,' * * *. 'He is not a Class-A citizen deserving of any consideration by you jurors,' * * * 'You have him in the palm of your hand now.' * * * 'You now have that person in the palm of your hand,' and, further, that this is all somehow a spending of tax money, and that, without a conviction, the taxpayer's money is going to be wasted. * * * 'If you want to keep St. Paul safe for yourselves and your relatives, you want to keep your property safe, and if you want to go to sleep at night * * * you must convict Perry, or he will return to these practices.' * * * 'If you want to keep St. Paul and Ramsey County safe, you must convict Perry.' "

Following this objection the court did instruct the jury to disregard all statements in the final argument except those based upon evidence submitted as the jury recalled the same.

■ We have reached the conclusion that a new trial is required. It is well settled that the results of a lie detector test are inadmissible in evidence against an accused because, up to the present at least, such tests have not been proved completely reliable; and, in extension of this rule, that evidence that such a test was taken or refused by a defendant cannot be brought to the jury's attention either directly or indirectly. State v. DeZeler, 230 Minn. 39, 41 N. W. (2d) 313, 15 A. L. R. (2d) 1137; State v. Kolander, 236 Minn. 209, 52 N. W. (2d) 458; LeFevre v. State, 242 Wis. 416, 8 N. W. (2d) 288; People v. Wochnick, 98 Cal. App. (2d) 124, 219 P. (2d) 70; People v. Aragon, 154 Cal. App. (2d)

646, 316 P. (2d) 370; 35 Minn. L. Rev. 310. As stated in the Kolander case (236 Minn. 221, 52 N. W. [2d] 465):

"* * * [W]e are in accord with the rule that the lie detector has not yet attained such scientific and psychological accuracy, nor its operators such sureness of interpretation of results shown therefrom, as to justify submission thereof to a jury as evidence of the guilt or innocence of a person accused of a crime.

\* \* \* \* \*

"* * * The impact upon the minds of the jurors of a refusal to submit to something which they might well assume would effectively determine guilt or innocence, under these conditions, might well be more devastating than a disclosure of the results of such tests, if given after a proper foundation had been laid showing how the apparatus functioned. Where a conviction rests so completely on circumstantial evidence, the erroneous admission of such action on the part of defendant might well be enough to tip the scales against him. We believe that it was prejudicial error to permit such refusal of defendant to submit to the test to be shown."

Here counsel for the state, although aware that the results of the test taken by defendant were inadmissible and that no reference should have been made to it, sought to bring to the minds of the jurors, for whatever effect it might have on them, facts which would indicate that the defendant had submitted to the test. Unquestionably the jury would conclude that since the test had been given and its results withheld from evidence it had been unfavorable to defendant. In other words, defendant's conviction may have been based on inferences drawn from evidence completely inadmissible. Defendant's testimony was to the effect that he had not participated in the robbery, and this was supported by testimony of other witnesses and other evidence. Accordingly, the references to the lie detector test may have tipped the scales against him.

■ The statements made by counsel for the state in his closing argument were far removed from the evidence. Obviously, they were so prejudicial to defendant that they would also require granting him a new trial. At times we have stated the principles which should govern the

argument of the prosecuting attorney in criminal proceedings. Thus we have said that he must refrain from condemning the accused on the authority of the government he represents, State v. Silvers, 230 Minn. 12, 40 N. W. (2d) 630, citing Berger v. United States, 295 U. S. 78, 88, 55 S. Ct. 629, 633, 79 L. ed. 1314, 1321; that he should not offer an opinion as to substantive evidence, State v. Gulbrandsen, 238 Minn. 508, 57 N. W. (2d) 419; that he should understand that it is part of his duty to conduct trials with fairness to the rights of a defendant, State v. Stockton, 181 Minn. 566, 233 N. W. 307; and that an argument which has the effect of inflaming the passion and prejudice of a jury against a defendant at the cost of justice cannot be upheld. State v. Morgan, 235 Minn. 388, 51 N. W. (2d) 61. See, also, State v. Schwartz, 266 Minn. 104, 122 N. W. (2d) 769; State v. Turnbull, 267 Minn. 428, 127 N. W. (2d) 157. In other words, the prosecutor's final argument must be based upon references to the evidence rather than to matters which cannot be regarded as evidence and which serve to divert the minds of the jurors from facts to which their consideration should be given in determining whether the accused is guilty or not.

While it is true that here the court sought to lessen the effect of the prejudicial argument described by instructing the jury that its decision should be based upon its consideration of the evidence submitted, we doubt if this erased the image of defendant which must have resulted from the prejudicial statements of counsel for the state set forth above. With respect to a similar situation, in State v. Turnbull, 267 Minn. 428, 435, 127 N. W. (2d) 157, 162, we said:

"* * * [T]he statements of the prosecuting attorney in his final argument * * * may well have prejudiced or inflamed the jury against the defendant. When such a situation is presented, it is doubtful if a cautionary instruction by the court will undo the damage. As stated in State v. Haney, 222 Minn. 124, 125, 23 N. W. (2d) 369, 370:

" '* * * There must be no conduct, either by argument or by the asking of irrelevant questions, the effect of which is to inflame the prejudices or excite the passions of the jury against the accused.' "

The order appealed from is reversed and a new trial granted.