STATE of Minnesota, Respondent,

v.

Patrick Thomas WALSH, Appellant.

No. C9–92–522.

Supreme Court of Minnesota.

Feb. 12, 1993.

As Amended Feb. 19, 1993.

John M. Stuart, State Public Defender, Cathryn Middlebrook, Asst. State Public Defender, Minneapolis, for appellant.

Robert M.A. Johnson, Anoka County Atty., M. Katherine Doty, Asst. County Atty., Anoka, Hubert H. Humphrey, III, Atty. Gen., St. Paul, for respondent.

SIMONETT, Justice.

After less than 4 hours of deliberation, the jury found defendant guilty of three counts of first degree murder under Minn. Stat. § 609.185(1), (2) & (3) (1990). Defendant was sentenced to life imprisonment. We affirm.

Shortly after 3 a.m. on May 31, 1991, as the result of two 911 calls, the police went to the home of Pamela Sweeney in Andover, Minnesota. Ms. Sweeney's body was found on the blood-stained bed in her bedroom, partially clothed with a bathrobe, her underclothes removed. The autopsy revealed she had died as a result of multiple stab wounds to the chest through the lungs and heart and four gunshot wounds to the head. The victim's head showed signs of being struck with a blunt instrument. There was no physical evidence of sexual assault, and blood in the vaginal area was determined to be menstrual.

The first 911 call was from the victim's boyfriend who had come home late, observed a damaged garage door, found the body, saw a man (the defendant) standing in the driveway, and called police from a neighbor's phone. About the same time this call was made, defendant also called to report the murder. Defendant identified himself as Patrick Walsh. He said when he came to the residence he saw the broken garage door, went in the house, and found Pamela murdered. He said he was a coworker and that he had been at the house about 45 minutes.

When deputies Longbehn and Duren arrived at the Sweeney residence, they observed three vehicles stuck in the driveway, two of them, as it developed, owned by the victim and the third, defendant's pickup. The garage door was busted out. Inside the house, the deputies found defendant still talking to the 911 operator. Deputy Longbehn handcuffed defendant, telling him he was not under arrest but was being handcuffed for the officers' safety and to determine what had taken place.

When asked what was going on, defendant said he didn't know, that he was a friend and co-worker of the victim; that he had come over about 12:40 a.m. to visit; and that he had been drinking at the Ole Piper Inn before that. Initially, defendant told deputy Longbehn that when he came to the house he saw the broken garage door and went in to see what was wrong. When asked again, he said he had broken the garage door by driving the victim's two cars through the door to help get his pickup unstuck.

While deputy Longbehn was questioning defendant, deputy Duren went upstairs and found Pamela Sweeney's body. He yelled down to Longbehn that she was dead and appeared to have multiple stab wounds. At this point, Longbehn moved defendant from the kitchen to the stairway and handcuffed defendant to the railing so that he could assist his partner while assuring preservation of the crime scene. The deputy observed blood stains in the area and a purse on the living room floor with its contents on the floor. When he went over to it, defendant said he had opened the purse to find the keys to Ms. Sweeney's cars.

About this time two Coon Rapids police officers arrived, and deputy Longbehn again questioned defendant, this time taking notes. Defendant repeated much of what he had said before. He also said he did not call for help immediately because he was scared and just wanted to get out of there. He added that he had been in trouble before for assault with a knife and said he had two knives in his pocket. These were removed. Thereafter, defen-

dant was placed under arrest and given the *Miranda* warning.

Subsequent investigation produced other evidence. Blood, consistent with the victim's, was found on defendant's clothing. Two bloody footprints in the kitchen matched defendant's tennis shoes. Grass from defendant's clothing matched grass from the Sweeney's backyard and two blades of grass were found on the victim's face. When deputy Duren checked the backyard and wooded area, his clothes became wet, just as defendant's clothing had been wet. A candy wrapper was found in defendant's pickup; similar candy was found in a kitchen drawer in the house. A subsequent search revealed a .22 caliber pistol (the defendant's) under some planks in the backyard and, in the wooded area, a butcher knife matching the victim's set.

Bullet fragments were found at the foot of the stairs. The victim's blood was on the stairs, in the hallway, and on the garage door handle. In the bedroom, the blood was spattered all over the ceiling and wall closest to the victim's body. Bloodstains in the bed suggested that the body at some point had been moved to the edge of the bed. A later search at defendant's office produced two notes in the defendant's desk, one with the victim's phone number and address, the other reading "Gun manual. Get gun."

Defendant and the victim had been co-workers for some 8 to 10 years at a computer corporation, the victim as a secretary and defendant as a computer operator. Some months before the murder, the two had car-pooled for awhile, but the victim ended the arrangement when she became uncomfortable in his presence. Thereafter, the victim began to get harassing phone calls which she believed were from the defendant. Twice she called her mother when she discovered defendant, uninvited, snowblowing her driveway. A co-worker testified the victim had told her of a time she discovered the defendant, uninvited, mowing her lawn. The victim had told her

pastor of fears for her safety, but she declined to call the police for fear of retaliation; she also refused to tell her supervisors at work because she was afraid they would think she was crazy. About a week before the murder, the victim lost her keys at work, apparently the same key set found by the police at the house.

The night of the murder, defendant was at the Ole Piper Inn, drinking and playing pulltabs. At one point, the waitress approached defendant for him to pay for some drinks she had left at his table. She testified that defendant grabbed her right arm tightly, and with a five dollar bill folded in his other hand whispered threateningly, "What else do I get for this five dollars?" The waitress said she was scared and hurried away, telling the owner she was not going to serve the defendant anymore because he gave her the "creeps."

At trial, defendant took the stand in his own defense. He claimed when he arrived at the Sweeney home the murder had already occurred. He attempted to explain away the web of evidence indicating his guilt, explanations which the jury evidently did not believe.[1]

On appeal, defendant raises three issues: (1) Were defendant's statements made at the crime scene prior to the *Miranda* warning admissible? (2) Were the two incidents of defendant's prior aggressive conduct towards women admissible as *Spreigl* evidence? and (3) Was there prejudicial misconduct in the prosecutor's final argument?

I.

Whether a *Miranda* warning should have been given defendant must be considered chronologically from the time the officers first met defendant to the point when he was finally arrested.

"On-the-scene" questioning, where the officers are simply trying to get a preliminary explanation of a confusing situation, does not require a *Miranda*

---

1. For example, at trial the defendant testified that he had loaned his .22 caliber pistol to Ms. Sweeney some time before the murder because of her fears; that he found the pistol on the bed when he discovered the victim's body; and then, because he was afraid he would be wrongly accused if found with the gun, that he put it under the planks in the victim's backyard.

warning. *See, e.g., State v. Martin,* 297 Minn. 470, 212 N.W.2d 847 (1973); *State v. England,* 409 N.W.2d 262 (Minn.App.1987). *See also Miranda v. Arizona,* 384 U.S. 436, 477–78, 86 S.Ct. 1602, 1629–30, 16 L.Ed.2d 694 (1966). There are occasions where the officers need to ask questions to sort out the situation and determine who, if anyone, should be arrested. But once a person is "in custody," *i.e.,* restrained to a degree associated with a formal arrest, a *Miranda* warning is required; and the degree of the restraint is tested by whether a reasonable person in the place of the detainee would have believed he or she was in custody. *State v. Rosse,* 478 N.W.2d 482, 484 (Minn.1991); *State v. Herem,* 384 N.W.2d 880, 883–84 (Minn.1986).

■ Here the initial questioning and the responses, despite the fact defendant was handcuffed, are admissible as part of a general preliminary investigation. The handcuffing restraint, by itself, did not mean defendant was in "custody" for purposes of *Miranda,* and the deputy even told defendant he was not necessarily under arrest. *Cf. State v. Nading,* 320 N.W.2d 82, 84 (Minn.1982) ("The fact that defendant and Williams were ordered to lie on the ground does not mean they were under arrest."). Here the deputies had just arrived on a confusing and gory crime scene in response to two nearly simultaneous 911 calls from different callers. It seems reasonable the officers should be allowed to ask the relatively general questions they asked without a *Miranda* warning, as even the defendant concedes. Thus defendant's initial statements giving his name, the time he had arrived, the reason he came over, his reason for not calling for help, and his contradictory statements about the garage door were all admissible.

■ Once the victim's body was discovered, however, the situation changed. Defendant's freedom was further restricted; he was handcuffed to the stair railing with a second set of cuffs. At this time the police knew for a fact that a violent crime had been committed and that defendant was the only one at the house. He had admitted ramming a car through the garage door, and had told officers he had been at the house for more than 2 hours before calling the police. His clothes were wet and bloodstained. At this point the deputy had at least a reasonable basis to believe that the defendant was the murderer, and he should have given a *Miranda* warning before any further questioning. Even though the officer told defendant several times he was not under arrest, any reasonable person who had been similarly frisked, handcuffed, bound to a stairway railing, and restrained in the presence of two (and eventually four) officers at the scene of a violent murder, would have believed he was in custody.

We conclude the statements obtained from defendant after he was handcuffed to the stair railing violated *Miranda.* Nevertheless, these statements, ruled admissible at the omnibus hearing and subsequently admitted at trial, clearly had no substantial or significant impact on the verdict. The evidence against defendant was strong. The statements made after the handcuffing to the stairs were quite innocuous; a few of the statements contradicted some of defendant's earlier statements, but defendant had already contradicted himself on numerous points during the initial questioning. We hold admission of these statements was harmless error. *See, e.g., State v. Forcier,* 420 N.W.2d 884, 887 (Minn.1988), citing *State v. Howard,* 324 N.W.2d 216, 221–23 (Minn.1982), *cert. denied,* 459 U.S. 1172, 103 S.Ct. 818, 74 L.Ed.2d 1016 (1983).

II.

The state sought admission of six incidents of prior bad conduct, all but one of which involved criminal offenses. One of the criminal offenses was admitted by the court, a 1976 conviction for the choking of a woman in her apartment. The other incident admitted was defendant's encounter with the waitress at the bar the night of the murder. The other four incidents were excluded.[2]

**2.** Assaults in 1966 and 1968 were rejected be-    cause defendant was then a juvenile and for

The trial judge reserved a final ruling on the proposed *Spreigl* evidence until the state reached the end of its case. *See State v. DeWald*, 464 N.W.2d 500, 504 (Minn.1991). Arguably, the waitress incident was admissible "as part of the occurrence or episode out of which the offense charged against defendant arose," *see* Minn.R.Crim.P. 7.02; *State v. Johnson*, 322 N.W.2d 220, 222 (Minn.1982), helping "[t]o complete the story of the crime by placing it in the context of nearby and nearly contemporaneous happenings." *McCormick on Evidence* (3d ed.) § 190 at 558. Here the court held an evidentiary *Spreigl* hearing at which both the waitress and defendant testified. The court found the evidence of defendant's aggressive conduct to be clear and convincing. The court further determined that both the 1976 assault conviction and the waitress incident showed a pattern of unprovoked physical aggression toward women; and because defendant denied he was the murderer, the two incidents were probative on the issues of defendant's identity and motive. The trial judge determined the probative value of this evidence outweighed any unfair prejudice.

■ Nevertheless, we have misgivings about the admissibility of the 1976 assault conviction. This incident was 15 years old, and, since then, there apparently had been no further aggressive episodes until the night of the murder. Weighing all the relevant factors, including the relative remoteness of the incident, its probative strength, and the strength of the state's case, it seems doubtful, or at least problematical, that the probative value of the assault evidence and the need for its admission would outweigh the potential for unfair prejudice. But, even if it were error to admit the assault conviction, the reception of this evidence was clearly harmless in view of the overwhelming evidence pointing to defendant's guilt of the crime charged. *See State v. Filippi*, 335 N.W.2d 739, 744 (Minn.1983). Defendant's problem at trial was not the 1976 assault incident,

but the physical and scientific evidence linking him to the murder and the need to explain his bloodstained presence and actions in the victim's house for 2 hours before the police were called. There was no reversible error in the admission of the *Spreigl* evidence. We might add that before the jury heard the *Spreigl* evidence and again in the court's final instructions, the jurors were given the standard cautionary instruction on the limited purpose of such evidence. *See* CRIMJIG No. 3.16.

### III.

■ In final argument to the jury, a prosecutor is governed by a unique set of rules which differ significantly from those governing counsel in civil suits, and even from those governing defense counsel in the very same criminal trial. These special rules follow directly from the prosecutor's inherently unique role in the criminal justice system, which mandates that the prosecutor not act as a zealous advocate for criminal punishment, but as the representative of the people in an effort to seek justice.

■ In this case the prosecutor suggested the fact that the victim was menstruating had ruined defendant's plan to have sex with her and enraged him to the point where he decided to kill her. "If he couldn't penetrate her with his penis, then he was, by God, going to do it with a butcher knife * * *." This theorizing had only marginal support in the evidence and was unduly inflammatory. *See, e.g., State v. Wahlberg*, 296 N.W.2d 408, 419 (Minn. 1980) (argument must be limited to the facts in evidence and the reasonable inferences flowing therefrom); *State v. Perry*, 274 Minn. 1, 14, 142 N.W.2d 573, 581 (1966) (prosecutor's argument should not seek to inflame or prejudice the jury against the defendant by improper assertions).

Also, in an effort to bolster the jury's belief in the reliability of the physical and scientific evidence, the prosecutor stressed that "your Anoka County Crime Lab is one of the finest and most respected Crime

remoteness in time; a 1970 assault was deemed too remote and dissimilar; and a 1970 crime

was rejected because defendant had been found not guilty by reason of insanity.

Labs in the state and you should be proud of them. And you should be proud of the investigators and the deputy sheriffs * * *." This was improper. Defendant further complains of the prosecutor's remark that "if we don't hold people accountable for the crimes they commit then the whole criminal justice system as we know it begins to lose its meaning." *See, e.g., State v. Merrill*, 428 N.W.2d 361, 372–73 (Minn.1988) (appeals to law and order are inappropriate).

We look, however, at the closing argument as a whole, rather than just selective phrases or remarks that may be taken out of context or given undue prominence. *State v. Booker*, 348 N.W.2d 753, 755 (Minn.1984). Even if an argument is in some respects out-of-bounds, it is normally regarded as harmless error unless the misconduct played a substantial part in influencing the jury to convict the defendant. *State v. Boitnott*, 443 N.W.2d 527, 534 (Minn.1989).

Here the improper statements comprised only a small part of the prosecutor's summation and, considering the overall thrust of the argument, would not have played a substantial part in the jury's deliberations. The state's theory of the case, aside from the reference to the notion that defendant committed the murder out of sexual frustration, was entirely supported by the evidence, and even this one reference was not entirely out of line with what the jury had heard and seen from the exhibits. In concluding, the prosecutor asked the jury, *"based upon the evidence,* to hold the Defendant accountable for exactly what he did." (Emphasis added.) Significantly, too, the defense never saw a need at the time to object to the remarks of which they now complain nor was a cautionary instruction requested. The prosecutor's comments now complained of do not rise to the level of reversible error.

Affirmed.

PAGE, J., took no part in the consideration or decision of this case.

GARDEBRING, Justice (dissenting in part and concurring in part).

I respectfully dissent as to the admission of the *Spreigl* evidence. I believe that the trial court abused its discretion by admitting defendant's 1976 conviction for choking a woman and his actions toward the waitress on the night of the murder.

Evidence of other crimes is generally inadmissible if it is offered to prove that the accused acted in conformity with a character trait when committing the charged offense. Minn.R.Evid. 404(b) (1992). Such evidence may be admissible, however, if it is offered "to establish motive, intent, absence of mistake or accident, identity or common scheme or plan." *State v. Slowinski*, 450 N.W.2d 107, 113 (Minn.1990) (citing *State v. Spreigl*, 272 Minn. 488, 491, 139 N.W.2d 167, 169 (1965)). Admission of such evidence is within the discretion of the trial court, and the trial court's decision is not to be overturned absent an abuse of that discretion. *Id.*

We have also held that *"Spreigl* evidence is 'admissible *only* if the trial court finds the direct or circumstantial evidence of defendant's identity is otherwise weak or inadequate, and that it is necessary to support the state's burden of proof.'" *State v. DeWald*, 464 N.W.2d 500, 504 (Minn. 1991) (quoting *State v. Billstrom*, 276 Minn. 174, 178, 149 N.W.2d 281, 284 (1967)) (emphasis added in *DeWald*). The rationale for the requirement that the *Spreigl* evidence come in only where the state's case is weak is because of its extraordinary potential for prejudice.

Prejudice can arise * * * from facts that arouse the jury's hostility or sympathy for one side without regard to the probative value of the evidence. Thus, evidence of convictions for prior, unrelated crimes may lead a juror to think that since the defendant already has a criminal record, an erroneous conviction would not be quite as serious as would otherwise be the case. A juror influenced in this fashion may be satisfied with a slightly less compelling demonstration of guilt than he should be.

*Edward W. Cleary, et al., McCormick on Evidence,* [hereinafter *McCormick on Evidence*] § 185 at 545 (3d. ed. 1984). As the majority here states, there was "overwhelming evidence pointing to defendant's guilt of the crime charged." *Ante,* at 606. The choking conviction was a dissimilar, unrelated crime that occurred fifteen years earlier. Defendant's actions toward the waitress were unrelated to his relationship to the victim. Neither piece of evidence helps the jury identify the crime charged as one typically committed by defendant, nor do they in any way suggest a motive. On the other hand, proof of defendant's propensity for violence could have easily aroused the jury's hostility. Because the potential for prejudice outweighs the probative value of the evidence and where the physical and scientific evidence linking appellant to the crime was so powerful, there was no need to allow the admission of the *Spreigl* evidence, and every reason to disallow it. It should not have been admitted.

Furthermore, the state argues that the *Spreigl* evidence is admissible because it shows a "repeating pattern of very similar conduct" of violence toward women. I disagree. Past crimes may be offered as proof of motive when they show "the existence of a larger plan, scheme, or conspiracy." *McCormick on Evidence,* § 190 at 559. Motive is more generally understood as the "[c]ause or reason that moves the will and induces action." *Black's Law Dictionary* 914 (5th ed. 1979). The offered *Spreigl* evidence does not show a larger plan, nor does it add proof as to why defendant would have murdered the victim. I therefore conclude that it fails to show motive.

To prove identity, *Spreigl* evidence must be similar to the charged offense either in time, location, or modus operandi. *State v. Landin,* 472 N.W.2d 854, 859 (Minn.1991). Identity can also be shown by "other crimes by the accused so nearly identical as to earmark them as the handiwork of the accused." *McCormick on Evidence,* § 190 at 559. Although defendant's actions toward the waitress were similar in time to the murder of the victim, neither piece of *Spreigl* evidence was so nearly identical to

the crime charged as to earmark it as the handiwork of defendant. The *Spreigl* evidence does prove a pattern of animosity towards women, but it does not show a repeating pattern of crimes committed in a similar manner. As the evidence does not show motive or identity, I believe that the trial court abused its discretion by admitting it.

The horrifying nature of the crime at issue here can hardly be overstated, and the escalation of violence against women in our society is deeply disturbing. However, proof that an accused has been violent in the past proves little as to guilt of the charged crime and is unnecessary where real proof of guilt is so abundant. The majority opinion in this case sanctions the misapplication of what is, at best, a highly risky rule of evidence.

I dissent as to this portion of the opinion.