STATE of Minnesota, Respondent,

v.

Scott Joseph PETERSON, Appellant.

No. C1–94–535.

Court of Appeals of Minnesota.

April 25, 1995.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty., J. Michael Richardson, Asst. County Atty., Minneapolis, for respondent.

John M. Stuart, State Public Defender, Evan W. Jones, Asst. State Public Defender, Minneapolis, for appellant.

Considered and Decided by DAVIES, P.J., RANDALL and MULALLY,* JJ.

## OPINION

RANDALL, Judge.

Scott Peterson appeals from his conviction and sentence for one count of first degree criminal sexual conduct and one count of second degree criminal sexual conduct. We reverse and remand for a new trial.

## FACTS

Between October 1990 and October 1992, Peterson babysat J.M., the son of Chuck and Esta Miller. J.M. had emotional and behavioral problems and received special education. Peterson, a child psychology student, was hired to care for him. As part of his job, Peterson would take J.M. to the movies and the YMCA, or at times they would just stay at J.M.'s home. The Millers would leave J.M. in Peterson's care while they were away from home for the evening, and they would return at approximately 10:00 to 11:00 p.m.

In the fall of 1992, Esta Miller noticed that J.M. reacted strongly to being left alone with Peterson. J.M. told his parents that Peterson had hurt him. On one occasion when Peterson arrived at the Miller home, J.M. was ready to lash out at him with a barbecue fork. J.M. was hospitalized soon after this incident because he would not go to school.

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

J.M. told a nurse and a police officer that Peterson had touched him inappropriately.

At the *Rasmussen* hearing, Dr. Barry Garfinkel, a child psychiatrist, testified that J.M. was learning disabled and was diagnosed with oppositional defiant disorder, characterized by vindictive behavior, a refusal to obey adults, and explosive disorder. J.M. had been hospitalized in the past because of behavioral problems. Dr. Garfinkel testified that J.M. would have difficulty telling his story in court. Dr. Garfinkel made the flat statement that if J.M. "saw Peterson," he would be traumatized and would not be able to testify. Dr. Garfinkel did concede that the prescription drug, Welbutrin, which J.M. took, helped control his outbursts. At the close of the *Rasmussen* hearing, the trial judge stated that J.M. could testify on videotape without Peterson present.

Prior to J.M.'s testifying, the trial judge interviewed him in chambers. The judge asked him if he was nervous, and J.M. answered yes. The judge asked J.M. if he was comfortable enough to "help them out," and J.M. answered yes. Finally, the judge asked J.M. if he understood the importance of telling the truth, and J.M. answered yes.

The judge then allowed J.M. to testify in the courtroom with his testimony recorded on videotape. J.M., the prosecutor, and defense counsel were present, but Peterson and the jury were excluded. Peterson was able to speak with his attorney by telephone. After J.M. left the stand, the videotape was played back to the jury and Peterson.

During the trial, the judge ruled for purposes of the record that he based his decision to allow J.M. to testify on videotape, without Peterson or the jury present, on the fact that J.M. had preexisting problems, took medication, and also on Dr. Garfinkel's recommendation. The judge also stated that J.M. said that he could not testify in front of Peterson.

The prosecution offered *Spreigl* evidence regarding allegations of another child, M.S. During her closing argument, the prosecutor commented on these allegations, stating that

these two boys reported what happened to them at the hands of [Peterson] totally

independent of each other, and the idea that this is somehow one big coincidence just stretches reality and common sense too far.

The prosecutor also stated

Don't look away from the sad reality of child abuse in terms of deciding whether this was proven. We talked about the fact that this happens in our society and that most of us are uncomfortable with that, but it happened here and you can't turn your back on these children.

Peterson's counsel objected to the prosecutor's comment and moved for a mistrial but the trial court denied this motion.

Approximately eight hours after deliberations began, one juror asked to leave the jury, stating

we the jurors can't or haven't all come to a unanimous verdict. It's frustrating to me being confined talking over and over the same issues and then the ones who can't come to agreement can't or will not state why.

The judge called the jury into the courtroom and read the note to the jury. The judge then told the jury:

I do want you to understand that, although it may not be a very pleasant duty, the jury will continue deliberating, and it's my intention that you will continue deliberating and be sequestered until a verdict is reached.

Defense counsel objected and again moved for a mistrial. The trial court denied the motion. The next day the jury returned with a unanimous verdict of guilty on two charges and an acquittal on one charge. Peterson appeals from his conviction and sentence.

## ISSUES

1. Did the trial court err in giving an instruction, after the jury had begun deliberations, that the jury would be sequestered until it reached a verdict?

2. Did the trial court violate defendant's right to confrontation by allowing a twelve-year-old witness to testify on videotape and excluding the defendant?

3. Did the prosecutor commit misconduct during closing arguments?

4. Did the trial court err in determining defendant's criminal history score?

## ANALYSIS

### I.

*Jury Coercion*

 Peterson argues that the trial court committed reversible error by instructing the jury to continue deliberating until they reached a unanimous verdict. We agree. So-called "dynamite" instructions are prohibited.

A hung jury is a legitimate end of a criminal trial, and is the occasionally inevitable result of requiring a unanimous verdict beyond a reasonable doubt.

*State v. Martin,* 297 Minn. 359, 367, 211 N.W.2d 765, 769 (1973). Judges are not required to spell out to jurors that a deadlock is a permissible result. But judges cannot tell juries they must reach a verdict. *State v. Petrich,* 494 N.W.2d 298, 300 (Minn.App. 1992), *pet. for rev. denied* (Minn. Feb. 23, 1993).

In *Petrich,* the trial court instructed the deadlocked jury that they, "must reach a unanimous verdict whatever it is." *Id.* Here, the judge told the deadlocked jury that it was his intention to keep the jury sequestered until they reached a unanimous verdict. In doing so, the judge "was more likely to have coerced a minority of the deadlocked jurors into reaching a unanimous verdict." *Id.*

The trial court told the jury to read the jury instructions again before resuming their deliberations. The state argues that the written jury instructions provided sufficient warning to the jurors not to surrender their honest opinions in order to reach a verdict. We disagree. The judge's verbal admonition was a straightforward statement to the jury that they had to stay sequestered and had to deliberate until they reached a unanimous verdict. Even though the trial judge may have meant to imply something less, his direct verbal instruction overshadowed any generalized boilerplate written instruction.

### II.

*Confrontation Clause*

Peterson contends that the trial court violated his constitutional right to confrontation by improperly allowing the twelve-year-old witness to testify on videotape while he and the jury were excluded.

 The Sixth Amendment provides in part that: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." U.S. Const. amend. VI. The United States Supreme Court has held that "the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Coy v. Iowa,* 487 U.S. 1012, 1016, 108 S.Ct. 2798, 2801, 101 L.Ed.2d 857 (1988). The United States Constitution provides this right because:

It is always more difficult to tell a lie about a person "to his face" than "behind his back." In the former context, even if a lie is told, it will often be told less convincingly.

*Id.* at 1019, 108 S.Ct. at 2802. Accordingly, a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where the denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured. *Maryland v. Craig,* 497 U.S. 836, 850, 110 S.Ct. 3157, 3166, 111 L.Ed.2d 666 (1990). In certain circumstances, protecting child witnesses from the trauma of a face-to-face confrontation with a defendant in a child abuse case is "sufficiently important to justify the use of a special procedure." *Id.* at 855, 110 S.Ct. at 3169; *accord State v. Conklin,* 444 N.W.2d 268, 272 (Minn.1989).

 Minnesota law permits courts to hear the testimony of certain witnesses outside the presence of the defendant in certain circumstances. *See* Minn.Stat. § 595.02, subd. 4 (1992). The statute is clear that testimony of a child witness may be taken outside the presence of the defendant "[i]n a proceeding in which [t]he child [is] *less than* 12 years of

age." *Id.* (emphasis added). Although the trial court recognized that J.M. was twelve at the time of trial, it allowed J.M. to testify on videotape and excluded Peterson.

Although a trial court has "broad discretion in controlling the manner in which testimony is received," *State v. Ross,* 451 N.W.2d 231, 235 (Minn.App.1990), we conclude that the trial court erred in allowing J.M. to testify only on videotape and excluding Peterson. The trial court's expansion of Minn. Stat. § 595.02, subd. 4 is disturbing for two reasons.

First, the trial court bypassed Peterson's right to confront his accuser almost exclusively on the basis of Dr. Garfinkel's "expert" testimony. At the end of the *Rasmussen* hearing, the judge had decided to allow J.M. to testify on videotape, even before he had interviewed him. The judge interviewed J.M. in chambers *after* he decided to allow the witness to testify via videotape. During the interview, the judge never asked the witness about his willingness to testify. The judge limited his questioning to the issue of veracity.

Second, we are concerned that affirming the trial court's expansion of the clear line the legislature drew in Minn.Stat. § 595.02, subd. 4, will ultimately undermine the Confrontation Clause.

We are aware of the difficulties J.M. faced in testifying while Peterson was in the courtroom. At the same time, every victim of every crime is put to the same issue of testifying in open court and facing their attacker, or not testifying and risking the chance that relevant evidence will not go to a jury. This issue, whether the accused can face his attackers in open court (regardless of the severity of the crime), is not only not unique, *but is as old as this country and our Eighteenth Century Constitution.*

There are few subjects, perhaps, upon which this court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation * * * is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.

*Pointer v. State of Texas,* 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965). The Confrontation Clause, as spelled out in the Bill of Rights, was intentionally inserted to avert the far greater evil of citizens being convicted, imprisoned, and at times executed, based on hearsay and innuendo, versus the lesser evil of a jury returning a verdict for the defendant because the state did not prove its case (if evil it is). The Minnesota legislature carved out a limited exception. That exception does not fit this case. We do not extend it.

### III.

*Closing Argument, Impropriety*

Peterson argues the prosecutor committed misconduct during closing argument. We agree. In considering a prosecutor's conduct, the Minnesota Supreme Court has cited the American Bar Association Standards for Criminal Justice as a model for guiding prosecutors' conduct. *State v. Salitros,* 499 N.W.2d 815, 817–18 (Minn.1993). The ABA Standards provide that it is unprofessional conduct for a prosecutor to

knowingly and for the purpose of bringing inadmissible matter to the attention of the judge or jury to offer inadmissible evidence, ask legally objectionable questions, or make other impermissible comments or arguments in the presence of the judge or jury.

American Bar Association Standards for Criminal Justice, Standard 3–5.6(b) (2d ed. 1980), *quoted in State v. Richardson,* 514 N.W.2d 573, 577 (Minn.App.1994). Reviewing courts will "pay special attention to [a prosecutor's] statements that may inflame or prejudice the jury where credibility is a central issue." *State v. Porter,* 526 N.W.2d 359, 363 (Minn.1995).

Here, the state introduced testimony from another minor, M.S., that Peterson had previously engaged in improper sexual conduct with him when Peterson worked at a group home. Peterson was never charged with a crime in relation to M.S. In her closing arguments, however, the prosecutor made repeated references to "both boys" ac-

cusing Peterson and to the "two" boys' accusations, and finally stated:

> these two boys reported what happened to them at the hands of [Peterson] totally independent of each other, and the idea that this is somehow one big coincidence just stretches reality and common sense too far.

This argument turned *Spreigl* evidence into improper substantive evidence. The prosecutor turned the case from one in which Peterson was on trial for molesting J.M. to one in which the jury was deciding whether Peterson molested J.M. and M.S.

The prosecutor's comments impermissibly implied that the jury would be defying common sense if they did not convict Peterson. *See Porter*, 526 N.W.2d at 364. In *Porter*, the supreme court held that the prosecutor's comment that a jury would be "suckers" for acquitting defendant constituted reversible error because the comments "were a blatant attempt to impinge on juror independence." *Id.*

▮ Peterson's counsel failed to object to this use of *Spreigl* evidence. A defendant's failure to object or to request curative instructions may constitute a waiver. *See State v. Caron*, 300 Minn. 123, 127, 218 N.W.2d 197, 200 (1974).

▮ However, we are further disturbed by the prosecutor's closing plea to the jury. The prosecutor stated:

> Don't look away from the sad reality of child abuse in terms of deciding whether this was proven. We talked about the fact that this happens in our society and that most of us are uncomfortable with that, but it happened here and you can't turn your back on these children.

Peterson's counsel immediately objected to this comment and moved for a mistrial.

Even ignoring the prosecutor's improper reference to more than one victim, the prosecutor's plea was intended to coerce or urge the jury to send a message to the children of the world "that we will protect you." The inevitable result was that the prosecutor's comment drew the jury's attention away from the particular facts of this case to broader societal problems. In *State v. Per-ry*, 274 Minn. 1, 142 N.W.2d 573 (1966), the prosecutor stated in closing:

> None of us are safe until we take care of those who maraud, murder, kill, and steal. * * * [Defendant] is the type of person who prowls at night.

*Id.* at 12, 142 N.W.2d at 579. In overturning the defendant's resulting conviction, the Minnesota Supreme Court stated:

> [T]he prosecutor's final argument must be based upon references to the evidence rather than to matters which cannot be regarded as evidence and which serve to divert the minds of the jurors from facts to which their consideration should be given in determining whether the accused is guilty or not.

*Id.* at 14, 142 N.W.2d at 581; *accord State v. Clark*, 296 N.W.2d 372, 377 (Minn.1980) (holding that a prosecutor's argument appealing to the crime problem in general as opposed to individual guilt is improper).

▮ Generally, once an appellate court determines that the trial court has erred, it should determine whether the error was harmless. *See Porter*, 526 N.W.2d at 365; *Conklin*, 444 N.W.2d at 275. We conclude the cumulative effect of the trial court's "dynamite" instruction, the violation of Peterson's right to confrontation, and the prosecutorial misconduct in closing argument combine to compel reversal as a matter of law. *See State v. Post*, 512 N.W.2d 99, 104 (Minn. 1994); *State v. Underwood*, 281 N.W.2d 337, 344 (Minn.1979). We are not "satisfied beyond a reasonable doubt" that the jury would have reached the same verdict despite the errors. We conclude the errors in this case were substantive and prejudicial. *Post*, 512 N.W.2d at 102.

## IV.

*Ambiguities in Criminal History Score*

Although our decision to reverse and remand the case makes Peterson's sentencing argument moot, we note *State v. Cromey*, 348 N.W.2d 759 (Minn.1984). In *Cromey*, it was impossible to establish from the general jury verdict whether the defendant was convicted of a severity level IX offense or a severity

level X offense. *Id.* at 760–61. When a sentencing court is faced with an ambiguous sentencing situation, "fairness dictates that it be considered the lesser of the two." *Id.* at 761; *see also State v. Marquetti,* 322 N.W.2d 316, 319 (Minn.1982) (holding that the state has the burden of proof in establishing a defendant's criminal history score for Sentencing Guidelines purposes).

## DECISION

The trial court's instruction to the jury to continue deliberating until they reached a unanimous verdict was prejudicial. The trial court's decision to allow the twelve-year-old witness to testify on videotape, excluding the defendant, was a violation of the defendant's right to confrontation. The prosecutor committed misconduct by making improper substantive use of *Spreigl* evidence, by appealing to juror passions, and by implying to the jury that they should use this case as a vehicle to take a stand on the general societal problem of child abuse.

**Reversed and remanded for a new trial.**